**UNITED STATES, Appellee**

**v.**

**Martell K. PRUITT, Airman First Class U.S. Air Force, Appellant.**

No. 96–0776.
Crim.App. No. S28961.

U.S. Court of Appeals for the Armed Forces.

Argued Dec. 4, 1996.

Decided June 9, 1997.

For Appellant: *Major Kevin P. Koehler* (argued); *Colonel Jay L. Cohen* (on brief); *Colonel David W. Madsen* and *Lieutenant Colonel Kim L. Sheffield.*

For Appellee: *Major LeEllen Coacher* (argued); *Colonel Theodore J. Fink* and *Lieutenant Colonel Michael J. Breslin* (on brief); *Major Jane M.E. Peterson.*

*Opinion of the Court*

CRAWFORD, Judge:

Contrary to his pleas, appellant was convicted by a special court-martial with members at Royal Air Force Lakenheath, England, of 2 specifications each of making a false official statement and of larceny, in violation of Articles 107 and 121, Uniform Code of Military Justice, 10 USC §§ 907 and 921, respectively. The convening authority approved the adjudged sentence of a bad-conduct discharge, 6 months' confinement, partial forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and the sentence. 43 MJ 864 (1996). We granted review of the following issue:

> WHETHER THE AIR FORCE COURT OF CRIMINAL APPEALS ERRED IN FINDING APPELLANT DID NOT SUFFER PREJUDICE EVEN THOUGH THE MILITARY JUDGE ERRED IN ADMITTING EXTRINSIC EVIDENCE OF UNCHARGED MISCONDUCT TO REBUT APPELLANT'S GOOD MILITARY CHARACTER.

We hold that the Court of Criminal Appeals did not err in holding that admission of extrinsic evidence of uncharged misconduct was harmless. Art. 59(a), UCMJ, 10 USC § 859(a).

## FACTS

Appellant was a postal clerk who sold money orders. The larceny charges against him arose when authorities discovered that two money orders had been sold for a higher amount than that imprinted on the money-order vouchers.

These vouchers are supposed to be exact copies of money orders sold. They are created at the same time the money orders are created and are retained by the post office for comparison with the corresponding money orders after they are cashed.

The first money-order voucher indicated that the corresponding money order was sold for $5.00. However, the money order was issued in the amount of, and was cashed for, $500. The second money-order voucher indicated that the corresponding money order was sold for $52.50. That money order was issued in the amount of, and cashed for, $552.50. This meant that the person who issued each of these money orders obtained a payment of $495 and of $500 more than was reported on the corresponding voucher. This was done either by taking the money directly from post-office funds or by withholding part of the funds actually received from the purchaser. At trial, the United States Postal Inspector for Europe testified that this process is the most common way that money-order funds are stolen.

Post-office forms show that appellant was responsible for the sale of the money orders in question. There was testimony that, at the end of each business day, postal employees complete PS Form 6019, a record of the money orders sold and money orders cashed that day. Appellant's signature on these forms shows that he issued and cashed both of the inaccurate money orders. Further, appellant's initials were on the back of the two money orders, indicating that he was the postal employee who cashed them. Appellant also signed the cash-register tapes, indicating that the amounts of the sales and cashing of the money orders were correct.

Appellant's former girlfriend, Sarah Russell, testified that appellant asked her to copy information onto a money order because he was playing a "joke" on someone at work and did not want that person to recognize his handwriting. A handwriting expert confirmed Ms. Russell's testimony that she had completed the money-order form. Appellant admitted that he asked Ms. Russell to fill out one of the money orders as a joke on his supervisor, but he denied cashing the money order or having any knowledge of the second money order.

During appellant's trial, the military judge permitted the Government to cross-examine defense witnesses on unrelated acts of misconduct allegedly committed by appellant. Specifically, the Government asked defense witnesses who testified to appellant's good character whether they knew that appellant had (1) videotaped a sexual encounter between himself and Sarah Russell without her

consent; (2) threatened to send the videotape to Ms. Russell's mother if Ms. Russell told appellant's wife about their relationship (which had occurred before appellant married); (3) held Ms. Russell down on the floor by her throat and threatened her; and (4) received punishment under Article 15, UCMJ, 10 USC § 815, for driving while intoxicated. The Government then asked the defense character witnesses whether they considered these acts to show good military character.

During rebuttal, the military judge allowed the Government to present extrinsic evidence that appellant had committed these bad acts. The Government called three witnesses: Special Agent Robert F. Powers, Sarah Russell, and Airman First Class Teyhones Lundy, all of whom testified about appellant's uncharged misconduct. In addition, the Government introduced the Article 15 which appellant had received for driving while intoxicated. The military judge admitted evidence of the uncharged misconduct, but only as it related to the issue of appellant's character. He also gave a limiting instruction to that effect.

The Court of Criminal Appeals held that the military judge erred in admitting the rebuttal testimony but the error did not materially prejudice appellant's substantial rights. *See* Art. 59(a). 43 MJ at 869–70.

### DISCUSSION

 Even though evidence of the character of an accused is logically relevant, it may not be introduced by the prosecution in the first instance,[1] unless it relates to an essential element of an offense or defense.[2] Character evidence "is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so over persuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Michelson v. United States*, 335 U.S. 469, 475–76, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948)(footnote omitted). If court members learn of bad character, they are more likely to convict on the basis of prior misdeeds than on the facts of the case. H. Kalven & H. Zeisel, *The American Jury* 160–61, 178–79 (1966). Excluding bad-character evidence "prevent[s] confusion of issues, unfair surprise and undue prejudice." *Michelson, supra* at 476, 69 S.Ct. at 219; *see also* Mil.R.Evid. 403, Manual for Courts–Martial, United States (1995 ed.). Thus, as the court below noted, "the accused holds the key to the character closet." 43 MJ at 867.

 That the prosecution may not introduce character evidence in the first instance "does not mean that the law clothes the accused with a presumption of good character or reputation."[3] *United States v. Tomchek*, 4 MJ 66, 70–71 (CMA 1977). Introduction of character evidence by an accused as circumstantial evidence of innocence is called placing the accused's character in issue. Character evidence by itself may raise a reasonable doubt as to the accused's guilt. *United States v. McPhail*, 10 USCMA 49, 51, 27 CMR 123, 125 (1958). The importance of military character evidence was emphasized by Professor Wigmore, as follows:

> The soldier is in an environment where all weaknesses or excesses have an opportunity to betray themselves. He is carefully observed by his superiors,—more carefully

---

1. Mil.R.Evid. 404(a), Manual for Courts–Martial, United States (1995 ed.), provides:
 *Character evidence generally.* Evidence of a person's character or a trait of a person's character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion, except:
 (1) *Character of the accused.* Evidence of a pertinent trait of the character of the accused offered by an accused, or by the prosecution to rebut the same; . . . .

2. Mil.R.Evid. 405(b) provides: *"Specific instances of conduct.* In cases in which character or a

trait of character of a person is an essential element of an offense or defense, proof may also be made of specific instances of the person's conduct."

3. Justice Jackson stated in *Michelson v. United States*, 335 U.S. 469, 475, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948): "Not that the law invests the defendant with a presumption of good character, but it simply closes the whole matter of character, disposition, and reputation on the prosecution's case-in-chief." (Citation omitted.)

than falls to the lot of any member of the ordinary civil community; and all his delinquencies and merits are recorded systematically from time to time on his "service record," which follows him throughout his army career and serves as the basis for the terms of his final discharge.

J. Wigmore, *Wigmore on Evidence* § 59 at 463 (3d ed.1940), quoted in 1A Wigmore, Evidence § 59 at 1252 (Tillers rev.1983).

Cross-examination concerning prior arrests or prior misconduct, if there is a good-faith belief for the question,[4] is the means of testing a witness' testimony concerning an accused's character. The purpose of such inquiries concerning an accused's prior arrests or misdeeds is to raise questions as to whether the witness has a sufficient basis to know an accused's reputation in the community or to raise questions about the witness' standard of evaluating good character. A classic example of this type of impeachment is as follows:

[A] character witness in a trial for murder ... testified she grew up with defendant, knew his reputation for peace and quiet, and that it was good. On cross-examination she was asked if she had heard that the defendant had shot anybody and, if so, how many. She answered, "three or four," and gave the names of two but could not recall the names of the others. She still insisted, however, that he was of "good character." The jury seems to have valued her information more highly than her judgment, and on appeal from conviction the cross-examination was held proper.

*Michelson*, 335 U.S. at 479 n. 16, 69 S.Ct. at 220 n. 16.

█ We agree with the Court of Criminal Appeals that the judge erred in allowing the prosecution to introduce extrinsic evidence of specific instances of misconduct by appellant. We must next examine whether that error materially prejudiced the substantial rights of appellant. Art. 59(a). We hold that it did not.

An evidentiary error may be harmless when evidence of the guilt of the accused is overwhelming. *See United States v. Hebert*, 35 MJ 266, 268 (CMA 1992); *United States v. Pearce*, 27 MJ 121, 125 (CMA 1988); *United States v. Mann*, 26 MJ 1, 5 (CMA 1988). The evidence against appellant was overwhelming. Numerous post-office documents indicated that appellant was responsible for issuing and cashing both money orders. Sarah Russell testified that she filled out one of the money orders at appellant's request. Appellant even admitted that he asked Ms. Russell to fill out one of the money orders.

Additionally, appellant's bad acts were completely unrelated to the charges against him. Appellant was convicted of larceny and making false official statements, offenses which have nothing in common with the uncharged misconduct involving drunk driving, assault, threats, or videotaping sex acts without permission. Second, evidence of the specific bad acts was admitted on rebuttal rather than during the Government's case-in-chief. Third, the military judge instructed the members that they were only to consider the specific bad acts on the issue of the weight of appellant's character evidence.

In light of the above, we hold that admission of the rebuttal evidence regarding appellant's specific bad acts was harmless error.

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

Chief Judge COX and Judges SULLIVAN, GIERKE, and EFFRON concur.

---

4. *Michelson*, 335 U.S. at 475, 482–84, 69 S.Ct. at 218, 221–23; *United States v. Wells*, 525 F.2d 974, 977 (5th Cir.1976); *United States v. Robertson*, 39 MJ 211, 214–15 (CMA 1994).