UNITED STATES, Appellee,

v.

Raymond D. KERR, Lieutenant Colonel,
U.S. Air Force, Appellant.

No. 98–0359.
Crim.App. No. 32249.

U.S. Court of Appeals for
the Armed Forces.

Argued June 3, 1999.

Decided Sept. 3, 1999.

GIERKE, J., delivered the opinion of the Court, in which COX, C.J., and SULLIVAN, CRAWFORD, and EFFRON, JJ., joined.

For Appellant: *Allison Ruttenberg* (argued); *Colonel Douglas H. Kohrt* and *Major Kevin P. Koehler.*

For Appellee: *Major Steven B. Thompson* (argued); *Colonel Anthony P. Dattilo, Major Ronald A. Rodgers,* and *Captain Steven D. Dubriske* (on brief); *Lieutenant Colonel Michael J. Breslin.*

Judge GIERKE delivered the opinion of the Court.

A general court-martial composed of members convicted appellant, contrary to his pleas, of drunk driving; indecent assault; and conduct unbecoming an officer by engaging in that conduct, in violation of Articles 111, 134, and 133, Uniform Code of Military Justice, 10 USC §§ 911, 934, and 933, respectively. The adjudged and approved sentence provides for a dismissal from the service and confinement for 6 months.

In an unpublished opinion, 1997 WL 801475, the Court of Criminal Appeals dismissed the charge of indecent assault as multiplicious, because it was included in the conviction of conduct unbecoming an officer. Unpub. op. at 3. The court also dismissed an allegation of maltreatment from the specification of conduct unbecoming an officer, *id.* at 8, but otherwise affirmed the remaining findings and the sentence, *id.* at 10.

This Court granted review of the following issues:

## I

WHETHER THE AIR FORCE COURT OF CRIMINAL APPEALS ERRED IN FINDING APPELLANT WAS NOT PREJUDICED BY THE MILITARY JUDGE'S ERROR IN ALLOWING THE PROSECUTION TO REBUT DEFENSE EVIDENCE OF APPELLANT'S GOOD MILITARY CHARACTER WITH SPECIFIC ACTS OF PRIOR MISCONDUCT OFFERED SOLELY TO REBUT THE CHARACTER EVIDENCE.

## II

WHETHER THE ADMISSION OF THE EVIDENCE OF THE SPECIFIC ACTS OF UNCHARGED MISCONDUCT BY THE APPELLANT HAD A PREJUDICIAL SPILLOVER EFFECT ONTO CHARGE III, SPECIFICATION 1.

## III

WHETHER THE AIR FORCE COURT OF CRIMINAL APPEALS ERRED IN FINDING THE APPELLANT SUFFERED NO PREJUDICE DESPITE FINDING THE ARTICLE 133 AND 134 CHARGES, CITING THE SAME UNDERLYING MISCONDUCT WERE MULTIPLICIOUS.

In addition, we specified the following issue:

WHETHER THE MILITARY JUDGE ERRED IN ALLOWING THE PROSECUTION TO REBUT DEFENSE EVIDENCE OF APPELLANT'S GOOD MILITARY CHARACTER WITH SPECIFIC ACTS OF PRIOR MISCONDUCT OFFERED SOLELY TO REBUT THE CHARACTER EVIDENCE, AND, IF SO, WHETHER THE AIR FORCE COURT OF CRIMINAL APPEALS ERRED IN FINDING APPELLANT WAS NOT PREJUDICED.

For the reasons set out below, we affirm.

### Factual Background

Appellant, an Air Force lieutenant colonel, commanded the Security Police Squadron at Patrick Air Force Base, Florida. He was accused of three separate incidents of indecent assaults and conduct unbecoming an officer. One alleged victim, CJ, was a Staff Sergeant in the Air Force Reserve and the wife of an enlisted member of appellant's squadron. The second alleged victim was Airman First Class (A1C) PD. The third alleged victim was a civilian employee. All three alleged victims were members of appellant's command.

Appellant was found not guilty of misconduct with PD and the civilian employee. The

issues in this appeal involve the charges pertaining to appellant's conduct with CJ.

CJ testified that she was performing active duty with the Military Personnel Flight on May 5, 1995. She and A1C PD worked in the same office but had not previously socialized. CJ and PD participated in the base sports day activities.

The facts on which the court below based its harmless-error analysis were recited in the unpublished opinion of the court below as follows:

> During a base sports day, [appellant] talked to CJ, the wife of an airman assigned to his squadron, and placed a baseball cap on her infant son's head. CJ's husband, Airman J, had been TDY [on temporary duty away from the base] for almost four months. CJ left the event with her son and the baseball cap. A short time later, appellant called her and said he was coming over. CJ told him not to come over because the house was a mess, but he insisted. Because she was uneasy, she called PD, the wife of another airman in the squadron. Appellant and PD arrived at about the same time. Appellant entered the house first and went immediately to the bathroom. On three different occasions CJ went to the bathroom in an effort to persuade appellant to leave. In each case appellant refused to leave. He hugged and kissed her, and fondled her breasts and vagina. CJ testified that she was afraid to resist because he was her husband's commander. Initially, she did not leave her house because she hoped he would go and her infant son was sleeping in another room. Eventually, PD's husband arrived and the security police were called. A subsequent blood test, approximately five hours after the incident, revealed a blood alcohol level of .092. Scientific testing also revealed the presence of saliva on CJ's breast.

Unpub. op. at 2.

The prosecution relied on the CJ's testimony to prove the indecent assault and conduct unbecoming an officer. PD circumstantially corroborated CJ's testimony. She saw appellant at CJ's house. She described CJ as having a "really puzzled look on her face" after CJ's first attempt to persuade appellant to come out of the bathroom and leave her house. After CJ returned from trying again to persuade appellant to leave, PD observed her crying, "very upset," with her shirt "all bunched up here and bunched up there" and her pants unbuttoned. PD summoned her husband, JD, who came to the house and observed CJ outside the house with PD. CJ was crying and saying that appellant "tried to take her pants off."

JD testified that CJ's face was red, she was "very hysterical," her shirt was pulled out, and the top buttons of her pants were unbuttoned. JD testified that the front door was locked from the inside, and he saw appellant running around inside, trying to hide. JD unlocked the front door, entered the house, and confronted appellant. JD testified that when he told appellant he was "just going to call the cops," appellant told him, "We can handle this ourselves, why don't you go get [CJ] and [PD]?" JD testified that appellant told him that "he's going to look dirty even though he isn't," and he wanted to keep it between them. JD testified, "That's when the conversation stopped and I went and called the cops."

The defense theory was that appellant went to CJ's house to retrieve his baseball cap, that CJ flirted with appellant and initiated the physical touching, and that she and PD contrived the accusation in order to get money from appellant. The flirting theory was based on CJ's admission that she put her arm around appellant's waist at the sports day activities after he put his arm around her shoulder. The asserted financial motive was based on CJ's testimony that she called her father after the incident, that her father was angry, and that her father suggested a civil lawsuit.

With respect to the drunk-driving charge, the defense disputed the accuracy of the methodology in computing appellant's blood-alcohol level and produced witnesses who testified that appellant did not appear intoxicated.

Appellant did not testify on the merits. The defense relied on witnesses to dispute

PD's and the civilian employee's allegations, and produced substantial evidence of appellant's good military character. No witnesses directly contradicted CJ's testimony.

As summarized by the court below, the documents offered by the defense "consisted of 87 character statements, 28 officer performance evaluations, 5 medal citations, a biography, 2 promotion recommendations, a listing of individual and unit awards received by appellant's current unit, and other items." Unpub. op. at 3. The defense argued, "The military judge will tell you that this good military character may in and of itself be sufficient to cause reasonable doubt." Defense counsel urged the court members: "This man is a great commander. Don't let these baseless allegations change that."

Granted Issue I and the Specified Issue arose because of evidence presented by the prosecution to rebut appellant's evidence of good military character. SD testified that she and appellant, both knowing that the other was married, began a sexual relationship in June of 1992, slightly less than 3 years before the charged offenses, which were alleged to have occurred in May of 1995. She worked at Kirtland Air Force Base, New Mexico, where appellant was assigned at the time. She testified that she called appellant and jokingly asked him if he intended to tell her goodbye before she went on vacation. She testified that appellant came up to her work area to say goodbye. She testified:

> We hugged and we kind of gave each other a friendly hug in the office and walked towards the door and kind of stopped in the doorway and were facing each other and gave each other another hug. And the next thing I knew we were kissing and then we went back in my office and had sexual intercourse.

She testified that appellant initiated that sexual encounter.

SD also testified that at a Christmas party in December of 1992, appellant asked her if she "wanted to have an affair." Although

she laughed and told him "he had to be kidding," they started an "affair" in January of 1993. SD testified, "It was mostly petting, heavy petting and necking and masturbation and oral sex." These activities took place in SD's office and in parked cars during the lunch hour. The "affair" lasted 5 or 6 months. It ended because appellant was reassigned and SD "got tired of it." SD testified that appellant returned to Kirtland AFB on temporary duty (TDY), and they again had sexual intercourse in her office.

On cross-examination, SD admitted that she "characterized" her sexual relationship with appellant as "rape" and "non-consensual." She admitted that, even though she considered the June 1992 event "rape," she didn't call out or file a complaint; that she removed her nylons, with appellant's help, before having sexual intercourse with him; and that she danced with him at the Christmas party in December 1992 even though he had "raped" her.

SD also testified that part of her reason for agreeing to the "affair" was to get revenge on appellant. Her revenge was to make him pay for lunch.

Finally, SD admitted that around June of 1992 she was seeing a mental health therapist and that she lied to the therapist about her "relationships with men."

The testimony of SD was admitted over defense objection. Defense counsel conceded that SD's testimony "might meet a [Mil.R.Evid.] 401 relevancy" test, but that it would not be admissible under Mil.R.Evid. 403, Manual for Court–Martial, United States (1995 edition)[1].

The military judge permitted the testimony. He explained his ruling as follows:

> Well, I would very much like for this court to focus on the charges before the court; and that is my objective. On the other hand, you have, as you were permitted to do under the rules, introduced evidence of 22 years of military good character. The prosecution is entitled to rebut that. This

---

1. All Manual provisions are cited to the version applicable at trial. The 1998 version is un-

changed, unless otherwise indicated.

evidence would not have been admissible on the merits of this case. If I applied the balancing test, if this were offered strictly as [Mil.R.Evid.] 404b evidence, I would have ruled it out, applying the balancing test. But in the face of the military good character evidence, the balance of the scales tips in the opposite direction. I'm going to admit the testimony of the witness.

Trial counsel specifically referred to SD's testimony in his rebuttal argument on the merits. He argued:

> The defense presented to you a lot of good military character evidence, that's true. But I'd ask you to think real carefully and real closely, is it a good military officer that also engages in extramarital affairs? Some may think that it was a cheap shot, us bringing in [SD], and talking to you about the extramarital affair that she had with this accused at Kirtland Air Force Base. The purpose was to show that these people who wrote these letters don't really know that accused. They know an individual that was a good commander. That we can't take away the fact that he helped his people and that he was a good officer, at least some of the time. But they don't know this man. They don't know the true Colonel Kerr. And that's why we brought in [SD], so that you members of the court would know the true Colonel Kerr. Not the good military character Colonel Kerr, but the true Colonel Kerr that also engages in extramarital affairs.

Before the court members began deliberations on findings, the military judge gave the following limiting instruction regarding SD's testimony:

> [SD]'s testimony about the accused's relationship with her is to be considered only for a limited purpose. Specifically, it was offered in rebuttal to the defense evidence concerning the accused's military character. Even if you find those events testified to by [SD] occurred, you may consider them solely for their value, if any, in evaluating the accused's military character. You may not infer from the testimony of [SD] that it is likely that the accused committed any of the offenses charged in this case.

On sentencing, the military judge instructed the members to arrive at an appropriate sentence "with due regard for the nature of the offenses, the background of the accused, and all other evidence presented here in court." He also instructed them to punish appellant "only for the offenses of which he ha[d] been found guilty."

### Discussion

#### Issues I and II: Harmless Error

Before the court below and this Court, appellant has asserted that the military judge erred by permitting the prosecution to rebut the defense evidence of good character with extrinsic evidence of specific instances of misconduct. *See United States v. Pruitt,* 46 MJ 148, 151 (1997). The court below found that the military judge erred, but that the error was harmless. Issues I and II challenge the lower court's harmless-error analysis.

We evaluate prejudice from an erroneous evidentiary ruling by weighing (1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question. *See United States v. Weeks,* 20 MJ 22, 25 (CMA 1985). We apply the same four-pronged test for erroneous admission of government evidence as for erroneous exclusion of defense evidence. *See United States v. Giambra,* 38 MJ 240, 242 (CMA 1993); *United States v. Banks,* 36 MJ 150, 170 (CMA 1992).

Applying this four-pronged analysis, we hold that the court below did not err by holding that admission of extrinsic evidence of misconduct was harmless error. *See Pruitt,* 46 MJ at 151. The Government's evidence of appellant's misconduct with CJ was strong. The testimony of PD, JD, and the scientific evidence of saliva on her breast corroborated her testimony. The defense presented no evidence to directly contradict her, relying instead on suggestion and insinuation, and an asserted financial motive that was unsupported by any direct evidence.

The defense suggestion that CJ initiated the sexual activity was contradicted by the evidence that she arranged to have PD present in her house while appellant was there.

SD's testimony was material. It directly contradicted appellant's evidence of good military character and attacked the major thrust of his defense.

The quality of the evidence was graphic, but some of it was of questionable credibility. Although no evidence contradicted SD's testimony that she and appellant had a 6–month affair, the credibility of SD's assertion that she was "raped" was undermined by her admission that she continued the "affair" for 6 months, and again had sexual intercourse with appellant in her office when he returned to the base on TDY.

One additional factor is relevant in this case. Any error in admitting the evidence did not involve the subject matter, but rather the form in which it was presented. It would have been permissible for SD to testify that, in her opinion, appellant was a deceitful, self-centered womanizer, so long as she did not describe specific acts. The defense would then have had to make the tactical choice of letting her opinion stand unchallenged or to explore the factual basis for it. *See* Mil. R.Evid. 405(a).

Appellant also argues that he was prejudiced by the spillover effect of SD's testimony. He argues that the military judge's limiting instruction could not cure the spillover effect, because SD's allegations were so similar to the charged offenses. *See United States v. Palacios,* 37 MJ 366, 368 (CMA 1993).

■ In *United States v. Southworth,* 50 MJ 74, 76–78 (1999), and *United States v. Curtis,* 44 MJ 106, 128 (1996), *rev'd as to sentence on recon.,* 46 MJ 129 (1997), we applied a three-pronged test to assess the danger of spillover:

(1) whether the evidence of one offense would be admissible proof of the other;

(2) whether the military judge has provided a proper limiting instruction; and

(3) whether the findings reflect an impermissible crossover.

50 MJ at 76. Both *Southworth* and *Curtis* involved issues of improper joinder, but we consider the same analysis useful in evaluating the danger of spillover from evidence of uncharged acts.

■ Applying this three-pronged test, we hold that appellant was not prejudiced by any possible spillover effect from SD's testimony. Applying the first prong, we note that the conduct described by SD was sexual but dissimilar in many respects from the conduct described by CJ. The military judge stated that he would not have admitted it under Mil.R.Evid. 404(b).

Even though SD testified that her relationship with appellant was nonconsensual, what she described was a 6–month mutual "affair." On the other hand, CJ described a sexual assault. SD's relationship with appellant was too dissimilar and too removed in time to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" under Mil.R.Evid. 404(b).[2]

SD's testimony did not portray appellant as a sexual predator. Instead, she portrayed him as deceitful and self-centered. The thrust of her testimony was to rebut the defense of good character. SD's testimony did not suggest that appellant indiscriminately assaulted women in his command. She suggested only that appellant cheated on his wife and used her for his pleasure.

Turning to the second prong, the record reflects a carefully crafted and detailed limiting instruction. The limited purpose of SD's testimony was clearly defined by the military judge: "rebuttal to the defense evidence concerning the accused's military character." 51 MJ at 405.

---

**2.** Mil.R.Evid. 413 took effect on June 26, 1998. *See* Manual for Courts–Martial, United States (1998 edition) at A25–52. We do not decide whether SD's testimony would have been admissible if Mil.R.Evid. 413 had been in effect at the time of appellant's court-martial. We note, however, that SD described consensual sexual conduct, not a sexual assault, even though she insisted that it was nonconsensual.

Turning to the third prong, the record negates any reasonable possibility of spillover. Appellant was convicted of only one of the three specifications of indecent assault. The two other specifications alleged similar sexual misconduct with an enlisted woman and a female civilian employee, but the court members found appellant not guilty of them.

On the basis of the entire record, we conclude that appellant was not prejudiced by any error in admission of SD's testimony.

### Issue III: Multiplicity

█ The court below considered the impact of dismissing one of the two multiplicious offenses and concluded that "the members sentenced appellant for his misconduct and not the number of allegations on the charge sheet." Unpub. op. at 3. In this case it was obvious, from the virtually identical specifications, that both specifications alleged the same act. In our view, the court below did not abuse its discretion in determining that appellant's sentence, whether for one specification or two, would have included at least a dismissal and the short period of confinement adjudged. *See United States v. Hawes*, 51 MJ 258 (1999).

### Specified Issue: Rebuttal Evidence

In light of our holding that any error in admission of SD's testimony was harmless, we need not address the merits of this issue.

### Decision

The decision of the United States Air Force Court of Criminal Appeals is affirmed.