# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
BURTON, RODRIGUEZ, and FLEMING
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist MYCHAL E. GARCIA**
**United States Army, Appellant**

ARMY 20180146

Headquarters, Fort Campbell
Matthew A. Calarco, Military Judge
Colonel Andras M. Marton, Staff Judge Advocate

For Appellant: Lieutenant Colonel Tiffany D. Pond, JA; Captain Jack D. Einhorn, JA; Captain Zachary A. Gray, JA (on brief).

For Appellee: Colonel Steven P. Haight, JA; Lieutenant Colonel Wayne H. Williams, JA; Major Dustin B. Myrie, JA; Captain Thomas J. Darmofal, JA (on brief).

22 July 2020

------------------------------
MEMORANDUM OPINION
------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

RODRIGUEZ, Judge:

On appeal, appellant asserts he was materially prejudiced by a civilian law enforcement agent's impermissible "human lie detector testimony" at trial.[1] For the reasons set forth below, we disagree.[2]

---

[1] An enlisted panel sitting as a general court-martial convicted appellant, contrary to his pleas, of four specifications of sexual assault in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 [UCMJ]. Specifications 1 and 2 of Charge I were charged in the alternative, as were Specifications 3 and 4 of Charge I. Granting trial counsel's motion after entry of findings, the military judge

(continued . . .)

## BACKGROUND

Appellant's civilian victim, CB, went to a night club with three female friends. There, CB became heavily intoxicated and did not recall most of the evening's events. After CB vomited and passed out, one of her friends, JC, decided it was time for all the women to return home. However, JC was unable to start the women's vehicle. Outside the night club, appellant and two other male Soldiers assisted JC and then followed the women home. Once home, JC assisted CB inside and laid her, fully clothed, on a bed alone in a bedroom. Appellant and the two other Soldiers also entered the home and initially remained in the living room area.

At some point, CB woke up "semi-conscious," and found herself naked from the waist down with appellant penetrating her vulva with his tongue. She then felt appellant penetrate her with his penis. CB testified she was not able to say anything and felt very weak. She testified that, eventually, she "[got] up enough energy to give a very small push and said, 'Stop.'" Appellant then left, and CB passed out again.

The next morning, CB went to the hospital to get a Sexual Assault Forensic Examination (SAFE). Although CB was unable to identify appellant, over the next few months the local civilian law enforcement's investigation led to identifying appellant as one of the three Soldiers who followed CB and her friends home from the club. Later, the results from CB's SAFE kit showed traces of appellant's sperm cells and amylase (a component of saliva), on the swabs taken from CB's vagina and labia.

At trial, Detective EM, the lead civilian law enforcement investigator, testified regarding her three interviews of appellant and his eventual admission to performing oral sex on CB and penetrating her with his penis. During Detective

---

(. . . continued)
dismissed Specifications 1 and 4 of Charge I conditioned upon Specifications 2 and 3 of Charge I surviving appellate review. The panel sentenced appellant to a dishonorable discharge, confinement for three years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged. Appellant's case is now pending review before this court pursuant to Article 66, UCMJ.

[2] We fully and fairly considered appellant's two other assigned errors, as well as the matters raised personally by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find they merit neither discussion nor relief.

EM's testimony, the military judge instructed the panel to disregard portions of her testimony that opined on appellant's credibility and guilt.

## LAW AND DISCUSSION

Appellant contends the military judge erred in allowing Detective EM to testify appellant "had lied or was a liar on six separate occasions." We will address each instance. Although Detective EM attempted to provide human lie detector testimony, we find appellant was not prejudiced as the military judge did not admit her testimony and provided prompt and directive curative instructions to the panel.

We review a military judge's decision to admit human lie detector testimony for an abuse of discretion. *United States v. Kasper*, 58 M.J. 314, 318 (C.A.A.F. 2003). Human lie detector testimony has been defined as "an opinion as to whether [a] person was truthful in making a specific statement regarding a fact at issue in the case." *Id.* at 315. Human lie detector evidence is inadmissible at a court-martial. *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citing *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007)). It is the "exclusive province of the court members to determine the credibility of witnesses." *Brooks*, 64 M.J. at 328 n.3. "If a witness offers human lie detector testimony, the military judge must issue prompt cautionary instructions to ensure that the members do not make improper use of such testimony." *Kasper*, 58 M.J. at 315 (citing *United States v. Whitney*, 55 M.J. 413, 415 (C.A.AF. 2001)). It is expected that a panel will follow the instructions given by the military judge. *United States v. Thompkins*, 58 M.J. 43, 47 (C.A.A.F. 2003).

### 1. Detective EM's Testimony

First, appellant asserts Detective EM's testimony regarding her first interview of appellant constituted impermissible human lie detector testimony. During the first interview, appellant provided names for the other two Soldiers who were with him at the club on the night of CB's assault. These names turned out to be fictitious. Detective EM's testimony that appellant provided her false names is not human lie detector testimony. Detective EM simply stated a known fact.

Second, appellant asserts Detective EM provided human lie detector testimony at trial when the military judge "allowed her to subjectively describe [appellant's] behavior" during her second interview of appellant at the Fort Campbell Criminal Investigation Command (CID) office. The video recording of Detective EM's second interview of appellant was admitted into evidence and published to the panel. Due to the grainy quality of the video footage, trial counsel asked Detective EM to describe her observations of appellant's physical characteristics and behavior during the second interview. Defense counsel objected on the ground that Detective EM's testimony would impermissibly offer an opinion on appellant's credibility.

3

The military judge overruled the objection in part, and allowed Detective EM to testify about her observations of appellant's physical characteristics. However, the military judge sustained the defense objection on any possible testimony regarding Detective EM's assessment of appellant's credibility, warning trial counsel as follows: "[T]rial counsel, if this witness comes within an inch of trying to tell the members that the physical characteristics she observed indicate anything about the accused's credibility, she will be done. That will end your direct examination and warrant an immediate instruction." The trial counsel indicated he understood, and Detective EM then testified that she observed appellant "[h]ad a closed-off posture . . . became increasingly nervous, began to sweat profusely, [and] also [broke] out in hives. [Appellant] became even more guarded and closed-off."

We find the military judge correctly limited Detective EM's testimony here in accordance with *Knapp*. 73 M.J. at 35-37 (law enforcement agent went "too far" by suggesting accused's physical reactions to specific questions indicated his responses to those questions were untruthful). In contrast to *Knapp*, Detective EM did not associate appellant's physical reactions to any specific questions she asked him in this second interview. Rather, Detective EM described at trial the physical reactions she generally observed in appellant during the second interview which, under these circumstances, did not constitute human lie detector testimony.

Appellant asserts Detective EM's third instance of human lie detector testimony was when she testified appellant "continued to make denials" to her until given the opportunity to provide a DNA sample. This testimony occurred during a long line of questioning between trial counsel and Detective EM regarding appellant's request to speak with her separately. Trial counsel asked Detective EM what she thought was the "turning point in the [second] interview" that "caused" appellant to request to speak with her separately outside the CID office. Detective EM replied that appellant "continued to make denials" and she told appellant "[t]he easy way to clear this up is to get a DNA sample." The detective stated appellant then agreed to provide a DNA sample, and "kind of leaned forward . . . and asked me if I was willing to meet off base. And I said yes."

Up to this point, we find Detective EM's trial testimony did not infer appellant was being untruthful. Her testimony was based on her personal knowledge and recollection of the circumstances leading to appellant's request to speak to her separately. *See, e.g., United States v. Martin*, 75 M.J. 321, 326 (C.A.A.F. 2016) (husband's testimony about wife's change in behavior after sexual assault was permissible testimony because it was based on personal knowledge).

Detective EM then continued to testify that, following appellant's request to meet with her "off base," she met with him outside the Fort Campbell Commissary and interviewed him a third time in her vehicle. It was during this interview that

appellant admitted to penetrating CB's vulva with his tongue and penis. Trial counsel then asked Detective EM, "[l]ooking back on that conversation, at what point would you say, from your observations was the turning point between when [appellant] denied penetration and admitted the penetration." Defense counsel objected, and the military judge sustained the objection.

In response to trial counsel's follow-up question on whether she had all the evidence in the case when she conducted appellant's third interview, Detective EM stated that sperm cells had been recovered from CB's SAFE examination samples. Trial counsel then asked the detective how long after the third interview she received the results of the DNA comparison of appellant's DNA with CB's samples. Detective EM replied that she could not remember the exact date, stating, "obviously, we wait until we get the comparison back to have a definitive answer of yes. And when the comparison came back, there was, you know, ---" At this point, the military judge stopped Detective EM mid-sentence and ended the direct examination.[3] The military judge instructed the members to disregard the entirety of Detective EM's answer and the trial counsel's question. All of the panel members responded affirmatively that they would follow the military judge's instruction.

We find no error as the military judge did not allow Detective EM's testimony and he promptly issued a curative instruction. We pause to note the military judge's termination of the trial counsel's direct examination of Detective EM underscored the importance of the instruction to the panel. *See, e.g., Kasper*, 58 M.J. at 315 (military judge is responsible for providing appropriate cautionary instructions to the members).

Appellant next claims that Detective EM's testimony broached human lie detector testimony a fourth time when the government published Prosecution Exhibit 37, the audio recording of appellant's third interview with the detective. At the beginning of the recording, appellant can be heard stating to Detective EM that he had lied while in the CID office. Detective EM then replied to appellant, "I knew you were being somewhat deceptive." Although defense counsel did not object, the military judge sua sponte provided the following curative instruction to the panel members to disregard that portion of Prosecution Exhibit 37:

> Panel Members, I want to direct your attention to one issue and give you an instruction. So only you, the members of the court, determine the credibility of the witnesses and what the facts are of this case. No witness can testify that an account of what occurred is true or

---

[3] Defense counsel also objected.

credible, that the witness believes the account, or that a crime occurred. One of the first lines that Detective [EM] said in [Prosecution Exhibit 37], which was the audio recording that you just heard, was 'I know you were being somewhat deceptive.' I want you to disregard that portion of [Prosecution Exhibit 37] completely. You cannot consider it or use it for any purpose. And to the extent that you believe Detective [EM] made an inference regarding credibility of the accused, I want you to disregard that. The facts are for you to decide and it is you, and you alone, who will determine what the facts tell you about the credibility of the evidence and the witnesses in this case.

The members responded affirmatively that they would follow the military judge's instruction.

The fifth instance, which contained human lie detector testimony, occurred when trial counsel questioned Detective EM on re-direct about her use of the Reid Technique while interviewing appellant. Detective EM responded, "[i]t is a useful technique for garnering confessions. I mean, I've never had a false confession from it . . . ." Defense counsel objected. The military judge sustained the objection and instructed the panel, "[t]he part of the answer where the witness said, 'I've never had any false confessions,' will be completely disregarded by the panel and not used for any purpose." The members responded affirmatively that they would follow the military judge's instruction. Detective EM's testimony inferred that she was able to divine when an accused was not being truthful with her. The military judge correctly ruled this testimony inadmissible and appropriately instructed the panel to disregard the testimony.

Lastly, appellant claims that Detective EM told panel members she could "paint him as a predator because his story did not match [CB's]" and, therefore, appellant was lying because his story did not "comport" with his victim's story. This sixth instance occurred after Detective EM's cross-examination by defense counsel concerning appellant's videotaped second interview at the CID office. Defense counsel asked Detective EM whether she "bragged" to appellant "[i]nside that CID room during the video" that she could "paint a picture of all you guys being predators?," to which Detective EM responded that she did not "brag."

During re-direct, trial counsel asked Detective EM, "[h]ow would you paint a picture of the accused as a predator?" Detective EM began to respond, "So basically, you know, from the story that they, you know, obviously [CB] was giving me, you know, this guy and these other Soldiers, one of them had come in the room, got on top of her . . .". Defense counsel objected. The military judge sustained the

objection and instructed the panel to not consider either the question or the answer. Detective EM's testimony inferred she believed appellant was not being truthful with her during the interviews. The military judge correctly ruled this testimony was inadmissible and appropriately instructed the panel to disregard the testimony.

## 2. Prejudice

Despite Detective EM's attempts to provide impermissible testimony opining on appellant's veracity, the military judge did not admit her testimony. Nonetheless, we must consider whether Detective EM's testimony materially prejudiced appellant's substantial rights. We consider four factors when determining whether a non-constitutional error substantially influenced the member's verdict: (1) the strength of the government's case; (2) the strength of the defense's case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question. *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999).

Here, the government's case was very strong. Appellant's sperm and amylase were found on the swabs of CB's vagina and labia. The only material issue at trial was whether CB consented to the sexual acts. However, CB's testimony, corroborated by the testimony of CB's three friends, established that CB was incapable of consenting because she was highly intoxicated and already passed out when appellant sexually assaulted her. Even without Detective EM's testimony regarding her three interviews of appellant, the government's case was very strong. Meanwhile, the defense case was very weak as it did not call any witnesses or present any evidence. While Detective EM's testimony was material because it undermined appellant's credibility, the quality and impact of this evidence was low because during the third interview, even prior to Detective EM impermissibly stating she knew appellant was being deceptive, appellant readily, and unprompted, admitted to her that he had not been truthful during his second interview in the CID office.

Moreover, unlike in *Kasper* and *Knapp*, the military judge in appellant's case issued prompt and detailed curative instructions. *See, e.g., United States v. Whitney*, 55 M.J. 413, 416 (finding CID agent's human lie detector testimony did not have a substantial influence on the findings where the military judge took quick remedial action and the government's case was strong). Without evidence to the contrary, we assume the members followed the instructions of the military judge. *United States v. Short*, 77 M.J. 148, 151 (C.A.A.F. 2018). Accordingly, we find Detective EM's testimony, which was ultimately not admitted, did not prejudice appellant's substantial rights.

## CONCLUSION

Specifications 1 and 4 of Charge I are conditionally SET ASIDE and conditionally DISMISSED conditioned upon Specifications 2 and 3 of Charge I surviving the final judgment as to the legality of the proceedings. *See* UCMJ, art. 57(c)(2) (defining final judgment as to the legality of the proceedings); *see also United States v. Britton*, 47 M.J. 195, 203 (C.A.A.F. 1997). The remaining findings of guilty and the sentence are AFFIRMED.

Senior Judge BURTON and Judge FLEMING concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court