# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39193**

————————————

**UNITED STATES**
*Appellee*

**v.**

**William T. FIERRO**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 6 June 2018

————————————

*Military Judge:* Vance H. Spath.

*Approved sentence:* Bad-conduct discharge and confinement for 3 months. Sentence adjudged 1 September 2016 by GCM at Peterson Air Force Base, Colorado.

*For Appellant:* Major Mark. C. Bruegger, USAF; Major Patrick A. Clary, USAF; Major Jarett F. Merk, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Mary Ellen Payne, USAF; Major J. Ronald Steelman III, USAF.

Before HARDING, SPERANZA, and HUYGEN, *Appellate Military Judges*.

Judge HUYGEN delivered the opinion of the court, in which Senior Judge HARDING and Judge SPERANZA joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

HUYGEN, Judge:

Appellant pleaded guilty to one specification each of attempted distribution of cocaine on divers occasions, reckless driving, use of cocaine, and pos-

session of cocaine on divers occasions, in violation of Articles 80, 111, and 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 911, 912a. A general court-martial composed of officer members sentenced Appellant to a bad-conduct discharge and confinement for three months. The convening authority approved the sentence as adjudged.

Appellant raises on appeal the following five issues, all related to the presentencing hearing and none to the findings of guilt: (1) whether the military judge erred by allowing trial counsel to elicit testimony as rebuttal and argue in sentencing the circumstances of Appellant's presence at the Planned Parenthood clinic where he was shot; (2) whether the military judge erred by denying one of Appellant's challenges for cause; (3) whether the military judge erred by instructing the panel members to disregard as a collateral consequence Appellant's loss of medical care and eligibility for Veterans Affairs healthcare benefits as a result of a punitive discharge; (4) whether the military judge erred by excluding two attachments to Appellant's written unsworn statement; and (5) whether trial counsel's sentencing argument that Appellant's status as a security forces member and his possession of drugs in a military chapel were aggravating factors was improper. We decide this case on the first issue, discuss the second issue in that context, and do not address the remaining three issues. On the first issue, we find error that materially prejudiced a substantial right of Appellant and thus set aside the sentence and authorize a sentence rehearing.

## I. BACKGROUND

### A. Charged Offenses

Appellant pleaded guilty to the following four charged offenses, all of which occurred before the shooting discussed below: (1) attempted distribution of cocaine on divers occasions between 1 January and 17 July 2015, some incidents of which involved Appellant offering cocaine to junior Airmen while all were on duty as security forces; (2) possession of cocaine on divers occasions because he showed the cocaine when he offered it; (3) reckless driving at an excessive speed while impaired by cocaine and alcohol on 17 July 2015; and (4) cocaine use on 16 July 2015.

### B. Shooting at Planned Parenthood Clinic

On 27 November 2015, Appellant and two women drove to the Planned Parenthood clinic in Colorado Springs, Colorado. Appellant parked his vehicle next to the vehicle of the shooter (RD). After saying to Appellant and his passengers "you chose a bad day to come here," or words to that effect, RD began shooting at Appellant's vehicle with an AK-47 rifle. The female passenger in the front seat of Appellant's vehicle was shot and seriously injured; the fe-

male passenger in the back seat was shot and killed.[1] Appellant, who had been driving, was on the opposite side of his vehicle from RD and fled on foot across the parking lot. RD walked towards the clinic, shot and killed a man outside the building, and entered the building through the outer door but was stopped from going further by the locked inner door.

When RD entered the clinic building, Appellant ran back to his vehicle, got in, and pulled out of the parking space. As Appellant was driving away, the body of the back-seat passenger, which was partially in the vehicle, fell out. RD exited the building and began shooting at the driver's side of Appellant's vehicle and another parked vehicle. One bullet disabled Appellant's vehicle; two bullets penetrated the vehicle door and struck Appellant in his left elbow and leg. Appellant's vehicle rolled out of the parking lot, across an access road, and to a stop in front of a nearby building. Appellant told the front-seat passenger to get help; tried to exit the vehicle; and immediately collapsed on the ground because of his injuries. After lying on the ground for some time, Appellant was pulled by a civilian bystander behind another vehicle for cover. Almost 30 minutes passed before a police officer dragged Appellant into the nearby building, which housed a doctor's office where he received basic medical care. An hour passed from the time Appellant was shot until he was transported by ambulance to a hospital.

At the time of trial, Appellant had undergone nine surgeries with additional surgeries expected and ongoing medical treatment necessary.

**C. Voir Dire**

Appellant chose a panel of officers to adjudge his sentence. As voir dire began, there were 13 court members, all of whom participated in group and individual voir dire. The military judge granted trial counsel's sole challenge for cause and one of the two Defense challenges for cause as well as the Defense peremptory challenge. The military judge denied the Defense challenge for cause of Colonel (Col) MM. Thus, a panel of ten officers, with Col MM as its president, adjudged Appellant's sentence.

During group voir dire, the Defense informed the then-13 court members that they would "hear more about how [Appellant] became one of the first victims of the Colorado Springs Planned Parenthood shooting," descriptions of the shooting, and the effects of Appellant's injury from the shooting on his life. Asked if anyone had "personal feelings for or against Planned

---

[1] The record of trial does not provide the first and last names of either passenger. This opinion refers to the two women as the front-seat and back-seat passengers.

Parenthood," Col MM and two other members were the only members to indicate they did. After voir dire, the other two members, Lieutenant Colonel (Lt Col) DMC and First Lieutenant (1st Lt) JHS, were excused as a result of the granted challenges for cause.

On individual voir dire, the military judge asked Col MM about Planned Parenthood.[2] Specifically, when asked about his feelings about Planned Parenthood, Col MM answered that he was "firmly against everything that they stand for and do." The military judge then asked Col MM, "But hypothetically you find out that you [and Appellant] share a different view [about Planned Parenthood], is that going to cause you to enhance his punishment for the offenses that you see here? . . . And then vice versa if you happen to agree on your views of Planned Parenthood, that's not going to cause you to decrease an appropriate punishment?" Col MM answered both questions "no."

The only other questions for Col MM about Planned Parenthood went as follows:

> Q [Defense Counsel]. I'm wondering if your position being firmly against what it is that they [Planned Parenthood] do, does that impact how you feel about those that use or support their services?
>
> A [Col MM]. I -- let me try to answer accurately, but it's hard to answer directly. I do not believe that there is a justifiable case to be made for abortion in any case, including rape, incest, or other. Those who choose to go that route, I believe are making a severe moral error. That does not equate to criminal activity in my view, but I have a significant religious and moral objection to anyone who would choose that route in any case.
>
> Q. So are those people committing sin?
>
> A. Absolutely.
>
> Q. And does that affect your judgment of their moral character?
>
> A. I will say no because you used the word "character." Their moral compass perhaps, or they haven't received the right guidance. We are all sinners and what sin we commit is our

---

[2] In the record, "Planned Parenthood" is used interchangeably to reference the organization and the 27 November 2015 shooting. Generally, the context makes clear whether the speaker is referring to the organization or the shooting.

own business, but certainly I would agree it is a sin and would disagree with those who pursue that route.

The Defense challenged Col MM for cause, arguing, inter alia, Col MM's views on Planned Parenthood manifested implied bias.

Ultimately, the military judge "did not detect any implied bias" for Col MM and concluded, "I believe anyone in the general public who watched [Col MM] and is not connected to this case would have no questions about why he would stay on this court considering the liberal grant mandate." The military judge then denied the Defense's challenge for cause of Col MM.

### D. Matters in Mitigation

In Appellant's written unsworn statement, his description of the Planned Parenthood clinic shooting included the following:

> In November 2015, I escorted two women to Planned Parenthood for an appointment. . . . I ducked and ran and managed to escape unhurt from the initial burst. But then I heard my friend [the front-seat passenger] screaming, and I had to run back to help her. When I got back to the car, I told her to be quiet and attempted to escape with her. . . . I knew she [the back-seat passenger] wasn't going to make it, and I was forced to make the horrible decision to leave her behind in order to try to save my friend and myself. . . . I pumped the brakes to stop and angled the car so that I would be the one to get shot if [the shooter] was still there, shielding my friend. I told my friend to be quiet, not argue, run toward the building, and she did. . . . I dragged myself to the entrance of the door to a nearby building, about 80-100 feet away. My friend was already inside . . . I know I managed to get my friend to safety. I believe I saved her life. I hope that my actions helped save others as well, although I don't know if it did. . . . I would ask the court to take into account my actions as a demonstration of my potential for redemption. That's not to say "look how heroic I am", but rather "look what I'm capable of" if given the chance.

Also in Appellant's written unsworn statement, he cited the shooting and his resulting injuries as a reason for the court members to grant "leniency," lessen his punishment, and not adjudge a punitive discharge, which would deprive him of military medical care.

The first sentencing witness called by the Defense was Detective (Det.) JS, Colorado Springs (Colorado) Police Department, who was the lead detective for the Planned Parenthood clinic shooting. He responded to the incident and later interviewed the shooter (RD) and victims of the shooting, including

5

Appellant. During direct examination, Det. JS described the shooting in the context of what happened to Appellant and the two passengers in his vehicle. The defense counsel and Det. JS referred to the two women with Appellant initially as Appellant's "friends" and then as his "passengers." Neither the defense counsel nor Det. JS made any reference to why Appellant and the two women were at the Planned Parenthood clinic on the day of the shooting.

Trial counsel initially referred to the two women as "friends" during the cross-examination of Det. JS. After having Det. JS describe what he saw in the surveillance video of the shooting, trial counsel elicited from Det. JS that he saw nothing that indicated Appellant "returned to the car with the purpose of saving his friend's life." Trial counsel then asked Det. JS, "What was the nature of the relationship with the people in the car?" The Defense objected, citing Rule for Courts-Martial (R.C.M.) 1001. Trial counsel responded, "It's rebuttal to mitigation and extenuation."[3]

During the Article 39(a), UCMJ, session that followed, the military judge and trial counsel elicited from Det. JS that the front-seat passenger was pregnant with Appellant's child and married to someone other than Appellant. Trial counsel then argued that the nature of the relationship was proper rebuttal because the Defense characterized the relationship as "friends," which was "not a full and accurate and complete characterization." Trial counsel contended that the Defense "opened the door to these types of questions" and that the Government could argue the nature of the relationship, not as aggravation, but as "rebuttal to mitigation extenuation [sic]."

Trial counsel answered "yes" to the military judge's question of "Were you planning on asking [Det. JS] about why [Appellant and the front-seat passenger] were [at the clinic] based on his investigation?" The military judge then turned to Det. JS,

> MJ [Military Judge]: Can you tell me what the answer to that would be?
>
> WIT [Det. JS]: She was scheduled to have an abortion.
>
> MJ: Okay. That part's easy for me. That 403, what I don't want to do is make this a debate about abortion because [it] is not.

---

[3] Trial counsel and the military judge and, eventually, defense counsel use the term "extenuation," but the Defense introduced evidence about the Planned Parenthood clinic shooting *only for mitigation*. There is no connection between the shooting and the charged drug and driving offenses, which all occurred at least four months before the shooting.

> And we already know that some of the court members, as you would find in any society, have strong feelings about abortion.

The Defense still objected to the evidence about the relationship between Appellant and the front-seat passenger, in part because the Defense had not "opened the door" and in part because the relationship evidence was "highly inflammatory" and thus more prejudicial than probative. The military judge explained that he would instruct the court-martial members who, he was confident, would put the evidence "in the right context" and overruled the objection.[4]

After the members returned, the military judge explained to them,

> I've overruled the objection but I'm allowing the testimony for a very limited purpose. It is -- and you haven't been instructed yet; I recognize that. Ultimately, I'm going to instruct you on your need to consider all matters in extenuation and mitigation, and aggravation. Extenuation are things not connected to the crime itself. For example, somebody's upbringing, be it difficult or hard as they were coming along, that's extenuation. It's an example of extenuation. Difficult life experiences disconnected from the crime.

> Mitigation has to do with the crime itself and why it is less serious or more serious -- less serious for mitigating, but I know you understand that.[5]

> So this relates solely to extenuation. A proper matter in extenuation certainly is the act of which the accused was a victim. I

---

[4] The Defense did not renew its challenge for cause of Col MM, and the military judge did not *sua sponte* re-open voir dire of Col MM or reconsider the denial of the challenge.

[5] This incorrect explanation of extenuation and mitigation is the only explanation of the terms by the military judge to the court members in the record. This explanation may have complicated matters if a member knew and applied the correct definitions of the terms and therefore believed that Appellant's relationship with the front-seat passenger and their presence at the Planned Parenthood clinic were somehow connected to Appellant's charged and convicted drug and driving offenses, which was not the case. While the "extenuation" mistake was repeated throughout the proceeding, including in the presence of the members, we did not accord it the significance sought by Appellant. The mistake was consistent, at least when the military judge and trial counsel were talking to the members about the Planned Parenthood clinic shooting as a matter in "extenuation" but meaning mitigation. The consistency of the mistake nullified its impact.

don't think there's any argument about that. It is going to be up to you to put it in the proper context, and then, ultimately, despite all matters in extenuation mitigation, or aggravation, to assess an appropriate sentence only for the offense of which the accused has been convicted. So you will get all those instruction[s] later. I just want to be really clear as to why this next question and answer are coming, and that it is solely for how you consider it as you find this matter -- the shooting -- extenuating. It is what weight you put to that, and that is it. It is not a matter in aggravation. It is not a matter really of anything else except for that limited context.

Trial counsel then asked Det. JS about "the nature of the relationship" between Appellant and the front-seat passenger.

A [Det. JS]. [Appellant] and the front seat passenger were in a relationship and she was pregnant with his child.

Q [Trial Counsel]. Was she married?

A. Yes,

Q. To [Appellant]?

A. No.

Q. What about the young woman in the back seat?

A. She was friends [with] the front seat passenger.

There were no further questions for Det. JS.

After Det. JS and two other defense witnesses testified, Appellant made a verbal unsworn statement, during which he referenced but did not describe the Planned Parenthood clinic shooting. His only mention of the front-seat passenger came at the end of his statement: "On a side note, the Planned Parenthood I can honestly say that I did not know that my friend was married until after-the-fact, which was very pleasant to explain to my parents. That is the truth, believe it or not."

During sentencing argument, trial counsel discussed Appellant's offenses, the principles of sentencing, the aggravating circumstances of Appellant's misconduct, and Appellant's unsworn statements. Talking about the shooting, trial counsel ended, "you can consider was it really that extenuating. He was there after having committed an affair with a married woman who was pregnant with his child. You can absolutely consider that as you are considering the extenuation . . ." Trial counsel requested a sentence of a bad-conduct discharge and confinement of two or three months.

Discussing the shooting during closing argument, the Defense referred to both passengers as Appellant's "friends" and described Appellant's actions as being taken "in the hopes of saving both [him and the front-seat passenger] of their lives and "so that [Appellant] will take any remaining fire and his friend would be able to get out to safety." The Defense asked the members not to adjudge a punitive discharge but to consider reduction in rank and confinement, with additional confinement instead of a punitive discharge.

After a review of the instructions and minor changes by the military judge, neither counsel objected to the instructions or requested additional instructions. When the military judge instructed the court members, he did not define mitigation or extenuation but said only,

> Although you must give due consideration to all matters in mitigation and extenuation, as well as to those in aggravation, you must bear in mind the accused is to be sentenced only for the offenses of which he has been found guilty.
>
> . . .
>
> In determining the sentence, you should consider all the facts and circumstances of the offenses of which the accused has been convicted and all matters concerning the accused. Thus, you should consider the accused's background, his character, his service record, his overseas service, all matters in extenuation and mitigation, and any other evidence he presented. You should also consider any matters in aggravation.

The court members adjudged a sentence of confinement for three months and a bad-conduct discharge.

## II. DISCUSSION

Appellant contends that the military judge abused his discretion by admitting as "rebuttal" evidence details about the relationship between Appellant and the front-seat passenger in Appellant's vehicle during the Planned Parenthood clinic shooting. We agree and conclude the improper rebuttal evidence influenced the adjudged sentence and materially prejudiced Appellant's substantial rights.

### A. Rebuttal Evidence

Trial counsel argued that the nature of the relationship between Appellant and the front-seat passenger—she was pregnant with Appellant's child and married to someone other than Appellant—rebutted two claims of the Defense: (1) that she was Appellant's "friend" and he was "escorting" her and another "friend" to the Planned Parenthood clinic "for an appointment" and

(2) that the shooting and Appellant's resulting injuries constituted pure mitigation. The military judge agreed that the relationship rebutted "the picture that the members have is basically he's a driver for some friends." We also agree but only by applying a non-standard meaning of "rebuttal."

Rule for Courts-Martial 1001 provides for the defense to present, for sentencing, "evidence in extenuation or mitigation or both." R.C.M. 1001(a)(1)(C). A matter in *extenuation* explains "the circumstances surrounding the commission of an offense, including those reasons for committing the offense." R.C.M. 1001(c)(1)(A). A matter in *mitigation* "is introduced to lessen the punishment to be adjudged by the court-martial, or to furnish grounds for a recommendation of clemency. It includes . . . particular acts of good conduct or bravery and evidence of the reputation or record of the accused in the service for . . . courage, or any other trait that is desirable in a servicemember." R.C.M. 1001(c)(1)(B). "The prosecution may rebut matters presented by the defense." R.C.M. 1001(d).

The function of rebuttal evidence is "to explain, repel, counteract or disprove the evidence introduced by the opposing party," and its scope is "defined by evidence introduced by the other party." *United States v. Saferite*, 59 M.J. 270, 274 (C.A.A.F. 2004) (quoting *United States v. Banks*, 36 M.J. 150, 166 (C.M.A. 1992)) (citation omitted). "Rebuttal evidence, like all other evidence, may be excluded pursuant to [Military Rule of Evidence] 403 if its probative value is substantially outweighed by the danger of unfair prejudice." *Id*. (citation omitted).

Arguably, the Defense's characterization of the front-seat passenger as Appellant's "friend" was not "evidence,"[6] and, even if it was, it could have been properly rebutted—in the typical sense of "rebut"—only by evidence that she was not his friend. Similarly, the Defense's characterization that Appellant was "escorting" two friends to the Planned Parenthood clinic "for an appointment," if "evidence," could have been rebutted only by evidence that Appellant was doing something other than what he claimed to be doing. The fact that Appellant and the front-seat passenger had at some point engaged in a sexual, possibly adulterous relationship that resulted in pregnancy does not repel, counteract, or disprove—in short, rebut—the fact that Appellant was friends with both passengers or that Appellant was escorting both to the clinic for an appointment.

---

[6] One could contend that the "nature of the relationship" evidence was not only not rebuttal but also not relevant "evidence" as defined by Mil. R. Evid. 401 because it did not make a fact of consequence more or less probable.

Furthermore, the Defense never introduced specific evidence why Appellant and his two passengers were at the clinic at the time of the shooting other than that one or both passengers had an appointment there. Appellant in his written unsworn statement and Det. JS during the Defense's direct examination declared only that Appellant and two passengers drove to the clinic and parked next to the shooter. The Defense also never falsely claimed or implied a purpose unrelated to Planned Parenthood for Appellant to be with either passenger or at the clinic.

In addition to rebutting the "friend" characterization, trial counsel maintained during the Article 39(a) session that the "nature of the relationship" was rebuttal because the shooting and Appellant's resulting injuries were "not quite as extenuating. He's committing a crime, and that's -- you know, he's there and that might be part of it." We presume that trial counsel was referring to the crime of adultery under Article 134, UCMJ, 10 U.S.C. § 934. The record lacks sufficient information to conclude that Appellant's sexual relationship with the front-seat passenger constituted a violation of Article 134 or any article of the UCMJ. The record is also devoid of any reference to the relationship as uncharged misconduct subject to Military Rule of Evidence (Mil. R. Evid.) 404(b).

During sentencing argument to the members, trial counsel omitted any reference to Appellant's relationship with the front-seat passenger involving a "crime" and instead said to the court members about the shooting, "you can consider was it really that extenuating. He was there after having committed an affair with a married woman who was pregnant with his child." The glaring disconnect between the matter in mitigation introduced by the Defense (that Appellant and a friend were shot and another friend killed in the Planned Parenthood clinic shooting and that Appellant continued to suffer from his serious injuries) and the purported "rebuttal" evidence presented by the Government (that Appellant and one of the two friends had had an extramarital affair that resulted in a pregnancy) begs the question of how the latter rebuts the former. We find it does but only by defining "rebut" to mean "explain." *Saferite*, 59 M.J. at 274. As a result, we conclude that, at least minimally, Appellant's relationship with the front-seat passenger explains the Appellant escorting both passengers to the clinic on the day of the shooting.[7]

---

[7] We contrast the "nature of the relationship" evidence with the evidence of Appellant's actions during the shooting and his reasons for taking them. In Appellant's written unsworn statement, he claimed that he ran back to his car to help his friend and that he angled his car to shield his friend. During cross-examination, trial counsel had Det. JS confirm that (1) nothing indicated to Det. JS that Appellant returned

*(Footnote continues on next page)*

**B. Military Rule of Evidence 403 Balancing Test**

While the evidence of Appellant's relationship with the front-seat passenger constituted rebuttal, albeit minimally, the evidence does not pass the balancing test of Mil. R. Evid. 403. Its marginal probative value was substantially outweighed by the danger of unfair prejudice it presented under the unique circumstances of Appellant's case. As a result, we conclude that the military judge abused his discretion by admitting the rebuttal evidence of the "nature of the relationship" between Appellant and the front-seat passenger.

Military Rule of Evidence 403 allows a military judge to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of [inter alia] unfair prejudice, confusing the issues, [or] misleading the members, . . ." and applies to rebuttal evidence. *Saferite*, 59 M.J. at 274. A military judge's decision to admit or exclude evidence is reviewed for an abuse of discretion. *United States v. Carter*, 74 M.J. 204, 207 (C.A.A.F. 2015). However, we review de novo any conclusions of law. *United States v. Chatfield*, 67 M.J. 432, 437 (C.A.A.F. 2009).

Sentencing evidence, like all other evidence, is subject to the balancing test of Mil. R. Evid. 403. *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000). A military judge enjoys "wide discretion" in applying Mil. R. Evid. 403. *Id.* When a military judge conducts a proper balancing test under Mil. R. Evid. 403, the ruling will not be overturned unless there is a "clear abuse of discretion." *Id.* A military judge abuses his discretion when (1) the findings of fact upon which he bases his ruling are not supported by the evidence of record; (2) he uses incorrect legal principles; or (3) his application of the correct legal principles to the facts is clearly unreasonable. *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)).

In cross-examination of Det. JS, trial counsel intended to elicit first the nature of the relationship between Appellant and the front-seat passenger and then the reason why they were at the clinic at the time of the shooting—he drove her to her appointment to abort his child. The military judge applied the Mil. R. Evid. 403 balancing test and prohibited the Government from ask-

---

to the car to save his friend and (2) Det. JS determined that Appellant found himself without cover and his car was his best chance for escape and cover. This testimony clearly constituted rebuttal, particularly on the type of mitigation—a particular act of bravery—that the Defense was claiming. (The Defense made no claim that Appellant had a general reputation or service record for courage or any other desirable character trait.)

ing the ultimate question, explaining, "what I don't want to do is make this a debate about abortion because [it] is not. And we already know that some of the court members, as you would find in any society, have strong feelings about abortion." Conversely, the military judge applied the Mil. R. Evid. 403 balancing test and allowed the Government to ask and Det. JS to answer the three questions that informed the court members that the front-seat passenger was pregnant with Appellant's child and she was married but not to Appellant.

The military judge required no input from either counsel to decide that the evidence the Government intended to introduce about the front-seat passenger's scheduled abortion failed the Mil. R. Evid. 403 balancing test. While the military judge did not initially use the words of the rule, it is clear to us he found the probative value of the evidence substantially outweighed by a danger of unfair prejudice. We concur. But we also agree with the Defense— and disagree with the military judge—that the admitted evidence about Appellant's extramarital relationship with the front-seat passenger and the resulting pregnancy made the same point as the excluded evidence about the scheduled abortion. To continue this analysis of "unfair prejudice," we must address the denied challenge for cause of Col MM.

At the time of Col MM's individual voir dire, the military judge and the court members knew only what the Defense had said at the beginning of voir dire—the court would hear about Appellant being a victim of the Planned Parenthood clinic shooting and the effects of the injury. When the military judge first asked Col MM about his "feelings one way or the other about Planned Parenthood," Col MM answered succinctly, "Just very firmly against everything that they stand for and do."[8] The military judge acknowledged having "some recollection" of the shooting, but, not knowing how Appellant "was involved" in the shooting or if the shooting "had anything to do with Planned Parenthood,"[9] the military judge informed Col MM that he would be instructed on and should consider all matters in mitigation and aggravation

---

[8] In Col MM's answers to questions about Planned Parenthood, he equates "Planned Parenthood" with abortion. Col MM was the first person to use the word "abortion" on the record, and Col MM did not acknowledge that Planned Parenthood provides health services other than abortion.

[9] The shooting occurred on 27 November 2015 at a Planned Parenthood clinic in Colorado Springs, Colorado. Appellant's trial began on 30 August 2016 at Peterson Air Force Base, which is in Colorado Springs. It is a near certainty that the court members had more than the military judge's "some recollection" of the shooting and if it "had anything to do with Planned Parenthood."

but that he should ultimately "just come to a sentence, based on the offense or offenses of which somebody's been convicted, that's appropriate." After Col MM agreed that what the military judge said made sense, Col MM answered "no" to the military judge's next and final two Planned Parenthood questions: whether having a different or similar "view" than Appellant would cause Col MM to "enhance" or "decrease" punishment.

The Defense asked Col MM if his position on Planned Parenthood impacted his feelings about people who "use or support their services," and he responded that he did not believe "there is a justifiable case to be made for abortion in any case;" people "who choose to go that route . . . are making a severe moral error;" and, while abortion "does not equate to criminal activity," he had "a significant religious and moral objection to anyone who would choose that route in any case." Asked if those people are "committing sin," Col MM responded, "Absolutely." Asked if people choosing "that route" and committing sin affected Col MM's "judgment of their moral character," Col MM responded "no because you used the word 'character.' Their moral compass perhaps, or they haven't received the right guidance. We are all sinners and what sin we commit is our own business, but certainly I would agree it is a sin and would disagree with those who pursue that route."

We recognize that the military judge, not knowing *during voir dire* how Planned Parenthood might or might not be an issue in Appellant's case, specifically addressed actual bias and then implied bias, applied the objective test, and considered the liberal grant mandate before denying the challenge for cause of Col MM. While Appellant's case is a very close one, we do not find the military judge abused his discretion *at the time of the Defense's challenge*, particularly because the military judge indicated on the record his consideration of the liberal grant mandate.[10] *See United States v. Townsend*, 65 M.J. 460, 464 (C.A.A.F. 2008) ("Where a military judge does not indicate on the record that he has considered the liberal grant mandate in ruling on a challenge for implied bias, we will accord that decision less deference during our review of the ruling.") (citations omitted).

---

[10] We consider significant the word "liberal" in "liberal grant mandate" and point out that "in close cases military judges are enjoined to liberally grant challenges for cause." *Townsend*, 65 M.J. at 465 (quoting *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007)). Still, we find ourselves in a similar position as Judge Baker in *Townsend*: "I think it was an easy call at the trial level to dismiss [the challenged member] from the member pool, but a harder call to do so on appeal as a matter of law." *Townsend*, 65 M.J. at 467 (Baker, J., dubitante).

However, Col MM's presence on the panel effectively became the substantial weight that tipped the scale to unfair prejudice when the military judge applied the Mil. R. Evid. 403 balancing test to the rebuttal evidence of the relationship between Appellant and the front-seat passenger. *Compare Manns*, 54 M.J. at 167 ("Because this was a bench trial, the potential for unfair prejudice was substantially less than it would be in a trial with members."). The military judge said he had "no idea how the members are going to feel" about the rebuttal evidence or how it was "going to play," but Col MM had already told him.

Even if the military judge kept out the word "abortion" from Appellant's presentencing proceeding, voir dire made clear that Col MM equated "Planned Parenthood" with abortion. Col MM considered abortion a sin and people who choose abortion sinners. It was obvious Col MM would have "a significant religious and moral objection" to Appellant. Col MM's view that people who choose abortion might not have "received the right guidance" could work even further against Appellant. Col MM could well deduce that Appellant was to blame for providing the wrong guidance to the married woman Appellant first impregnated and then got shot when he escorted her to the "Planned Parenthood," or abortion, clinic.

Moreover, trial counsel "played" to Col MM as a jury of one when counsel told the members to consider whether the shooting was "really that extenuating" as Appellant was at the clinic on the fateful day "after having committed an affair with a married woman who was pregnant with his child." The probative value of the "nature of the relationship" between Appellant and the front-seat passenger was substantially outweighed by the danger of unfair prejudice of the inescapable inference, particularly by Col MM, that Appellant escorted his married friend to the clinic for an appointment to abort his child. As the military judge himself framed it, "Why she was going down there, they have common sense. I'm sure they're going to have some guesses."

When the military judge prohibited trial counsel from eliciting testimony why the front-seat passenger was at the Planned Parenthood clinic on the day of the shooting, the military judge explained that he did not want to "make this a debate about abortion" and recognized "strong feelings about abortion" of "some of the court members," presumably referring to Col MM. Applying similar rationale, we find the military judge's application of the correct legal principles—whether the probative value of the evidence substantially outweighed the danger of unfair prejudice—to be clearly unreasonable. *See Ellis*, 68 M.J. at 344. The military judge erred by admitting the evidence of the relationship between Appellant and the front-seat passenger, particularly in light of Col MM's presence on the panel, and the error allowed the "debate about abortion" into Appellant's sentencing.

**C. Prejudicial Error**

Having determined that the military judge abused his discretion by admitting the evidence of the "nature of the relationship" between Appellant and the front-seat passenger as rebuttal to mitigation in sentencing, we consider the impact.

> The question now becomes whether Appellant was prejudiced by this error. We test the erroneous admission or exclusion of evidence during the sentencing portion of a court-martial to determine if the error substantially influenced the adjudged sentence. If so, then the result is material prejudice to Appellant's substantial rights.

*United States v. Griggs*, 61 M.J. 402, 410 (C.A.A.F. 2005) (citations omitted). Further, we echo the view of our sister court that, "[w]hile we typically test for prejudice using the factors set out in *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999),[11] the analysis set out in *United States v. Saferite* is more useful for sentencing errors." *United States v. Wagers*, No. 201600180, 2017 CCA LEXIS 112, at *12 (N-M. Ct. Crim. App. 23 Feb. 2017) (unpub. op.) (citations omitted) (footnote inserted). In *Saferite*, the Court of Appeals for the Armed Forces found the military judge's abuse of discretion to be harmless error because, inter alia, the rebuttal evidence at issue was already before the members and the maximum possible confinement was 230 years, trial counsel requested 16, and the members adjudged 6. *Saferite*, 59 M.J. at 274-5.

Based strictly on the nature of the offenses to which Appellant pleaded and was found guilty and their aggravating circumstances, particularly Appellant's attempts to involve junior Airmen in his illegal drug use, the adjudged sentence of a bad-conduct discharge and three months of confinement does not appear inappropriate or unduly severe. However, our consideration of two factors leads us to conclude that the error of admitting the "nature of the relationship" evidence prejudiced Appellant.

First and unlike in *Saferite*, the rebuttal evidence at issue in Appellant's case—the "nature of the relationship" evidence—would not otherwise have been before the members. Moreover, the panel, with Col MM as its president,

---

[11] "We evaluate the harmlessness of an evidentiary ruling by weighing: '(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question.' *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999)." *United States v. Bowen*, 76 M.J. 83, 89 (C.A.A.F. 2017).

adjudged the exact maximum sentence recommended by trial counsel: a bad-conduct discharge and three months of confinement.

Secondly, Appellant's matters in mitigation, which made for a strong Defense sentencing case, mean the appropriate sentence is based on more than just Appellant's offenses and evidence in aggravation, which made for a strong Government sentencing case. The military judge described himself as having "great empathy" for Appellant because of the shooting and described the shooting and Appellant's resulting injuries as "powerful [mitigation] evidence and that's okay. It should be powerful." We concur. By admitting the "nature of the relationship" evidence, which was immaterial to the question of a sentence for Appellant's convicted offenses, the military judge allowed the Government to present information of unrelated activity and possible misconduct—irrelevant evidence in aggravation under the guise of rebuttal to mitigation. Unlike in *United States v. Eslinger*, 70 M.J. 193, 201 (C.A.A.F. 2011), the possibility in the instant case that Appellant would have received less confinement or avoided a punitive discharge absent the admitted "rebuttal" evidence was *not* remote. As a result, we conclude the error substantially influenced the adjudged sentence and materially prejudiced Appellant's substantial rights.

### III. Conclusion

The findings of guilt to the charges and specifications are **AFFIRMED**. Article 66(c), UCMJ, 10 U.S.C. § 866(c). The sentence is **SET ASIDE**. The record of trial is returned to The Judge Advocate General for remand to the convening authority who may order a sentence rehearing. Article 66(e), UCMJ, 10 U.S.C. § 866(e). Thereafter, Article 66(b), UCMJ, 10 U.S.C. § 866(b), will apply.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court