# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

## No. ACM 40268

————————————

### UNITED STATES
*Appellee*

v.

### André T. FALLS DOWN
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 3 August 2023

————————————

*Military Judge*: Christina M. Jimenez.

*Sentence*: Sentence adjudged 10 December 2021 by GCM convened at Creech Air Force Base, Nevada. Sentence entered by military judge on 23 March 2022: Dishonorable discharge, confinement for 3 years, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant*: Major Eshawn R. Rawlley, USAF; Peter Kageleiry, Jr., Esquire.

*For Appellee*: Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, RAMÍREZ, and ANNEXSTAD, *Appellate Military Judges*.

Judge RAMÍREZ delivered the opinion of the court, in which Chief Judge JOHNSON and Judge ANNEXSTAD joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

RAMÍREZ, Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1] The members found Appellant not guilty of a second specification of sexual assault against the same victim in violation of Article 120, UCMJ. The military judge sentenced Appellant to a dishonorable discharge, confinement for three years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority took no action on the findings or sentence.[2]

Appellant raises three issues on appeal, which we reword as follows: (1) whether Appellant's conviction for sexual assault is legally and factually sufficient; (2) whether the military judge abused her discretion when she found a good faith basis for trial counsel to ask a witness, "are you aware that [Appellant] had an allegation of sexual assault made against him?"; and (3) whether Appellant was deprived of a constitutional right to a unanimous verdict.

As to Appellant's third issue, after the briefing in this case, the United States Court of Appeals for the Armed Forces decided the case of *United States v. Anderson*, which held that military accuseds do not have a right to a unanimous verdict under the Sixth Amendment, the Fifth Amendment's[3] due process clause, or the Fifth Amendment's component of equal protection. __ M.J. __, No. 22-0193, 2023 CAAF LEXIS 439, at *3–4 (C.A.A.F. 29 Jun. 2023). Therefore, Appellant is not entitled to relief for this issue. As to the remaining issues, we find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and sentence.

---

[1] All references in this opinion to the UCMJ, the Military Rules of Evidence, and the Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Although not raised by Appellant, we note the convening authority erred by failing to state the reasons why he denied Appellant's request to defer confinement. *See United States v. Sloan*, 35 M.J. 4, 7 (C.M.A. 1992), *overruled on other grounds by United States v. Dinger*, 77 M.J. 447, 453 (C.A.A.F. 2018); *see also* R.C.M. 1103(d)(2) (stating decisions on deferment requests are subject to judicial review for abuse of discretion). We further note Appellant did not object to the convening authority's failure to state the reasons for denying the request. *See* R.C.M. 1104(b) (permitting parties to file post-trial motions to address various matters, including errors in post-trial processing). Under the circumstances of this case, we find the omission did not materially prejudice Appellant's substantial rights. *See United States v. Scalo*, 60 M.J. 435, 436 (C.A.A.F. 2005) (citations omitted).

[3] U.S. CONST. amend. VI, V.

## I. BACKGROUND

Appellant and CC[4] met in early 2020 while stationed at Creech Air Force Base (AFB), Nevada (NV). They dated during the months of March and April in 2020.

At the beginning of her relationship with Appellant, CC lived in the dorms at Nellis AFB, and Appellant lived with a roommate in an apartment in nearby Centennial, NV. On 15 April 2020, CC and her friend, Senior Airman (SrA) GC, moved out of the base dorms and into a rental house in Centennial, approximately five minutes from Appellant's apartment.

During the time that CC and Appellant dated, they had sex on multiple occasions. After they broke up, they remained friends and would text each other every day or every other day. They also had consensual sex twice after breaking up. Both of those times were situations in which CC initiated sex. After an issue occurred between the two of them in mid-May 2020, CC told Appellant that she no longer wanted to have sex with him. They did, however, remain friends. CC then began a romantic relationship with SrA NW.

On the evening of 30 May 2020, CC and SrA GC hosted a "cup pong tournament"[5] at their house. Approximately 20 people showed up to the party/tournament between 2030 and 2130 hours. CC explained that she reached out to Appellant and invited him to the party because there had been a recent suicide at Appellant's squadron and Appellant "told [CC] that he wanted some human interaction." They exchanged several text messages about whether Appellant should or should not go to the party, but ultimately he did.

CC did not drink alcohol that night. Appellant was drinking beer. Appellant left the party at approximately 0140 hours. Shortly after leaving, he sent CC a series of text messages conveying that he did not think they should talk anymore. However, CC did not read those messages until hours later.

At some point in the night there was a confrontation between guests including SrA NW. Then CC and SrA NW got into their own confrontation and CC told SrA NW that he needed to leave her house and that she did not want to speak to him again. Because she was upset, CC also left the house and went to sit in her car. Shortly thereafter, SrA GC called CC to tell her that there has been a shooting outside of their house. Apparently, CC's neighbor was upset by the noise from the party and shot his gun towards their house. CC then got out of her car, went into the house, and ran upstairs. In the process of running

---

[4] CC was an enlisted active-duty member of the United States Air Force.

[5] According to CC, "Cup pong is a game where the cups are filled up with about an inch and a half of water, and there's two teams against each other on a table, and the goal is to throw as many ping pong balls as you can into the opposite side's cups."

upstairs, CC tripped and injured her ankle. The injury was significant enough that she needed medical attention. CC and SrA GC determined that CC needed to go the hospital. However, SrA GC did not have a license, so she could not drive. They considered calling SrA NW, but CC had just told him that she did not want to speak to him again. Within CC's friend group, this left Appellant, who lived only five minutes away, so they contacted Appellant.

Appellant drove from his apartment to CC's house to pick her up, but he did not take her directly to the hospital. Instead, they drove back to his apartment to wait for SrA GC because SrA GC had remained at her house to speak with the police about the shooting. While they were waiting for SrA GC at Appellant's apartment, Appellant suggested that CC soak in cold water in his bathtub. She did so fully clothed. After speaking with the police, SrA GC took an Uber to Appellant's apartment. When SrA GC arrived, she and Appellant helped CC to change out of her wet clothes and into a pair of Appellant's shorts and sweatshirt. Once CC was in dry clothing, Appellant drove them to the hospital.

At the hospital, only one person was allowed to go inside with CC due to COVID-19 protocols. SrA GC went inside with CC and Appellant stayed in his car in the hospital parking lot. While CC was being treated, SrA GC contacted some friends from work (other Airmen) who lived at the Nellis AFB dorms to tell them what had happened. Those friends drove to the hospital and waited for CC to be released.

At the hospital, CC was given a dose of hydrocodone before being x-rayed, evaluated, and treated. The treatment included a boot-like ankle brace. By the time CC left the hospital at approximately 0600 hours on 31 May 2020, she was feeling the effects of the hydrocodone. She testified that she "felt nauseous, dizzy, extremely tired, and ultimately high." SrA GC described CC as appearing to be "[d]isoriented, just loopy overall, [and that] she just didn't seem coherent." One of the Airmen who drove to the hospital explained "you could definitely tell [CC] was on medication. She looked kind of drowsy kind of out of it I should say." The Airman further explained, "personally, I don't think she knew where she was, like fully." He also explained that he and the other Airmen helped her into Appellant's car.

The group decided that neither CC nor SrA GC should go back to their house because of the danger of their neighbor and the shooting. SrA GC went with their friends from the dorms to sleep there and CC went with Appellant to sleep at his apartment. Before returning to Appellant's apartment, he and CC went to a fast-food restaurant to pick up breakfast. When they arrived at Appellant's apartment, Appellant's roommate was there and he remained for a few minutes. Appellant's roommate, SrA IA, testified that CC seemed "coherent," seemed to be aware of her surroundings, and to his knowledge, she

did not appear to be under the influence of drugs. He also testified that he saw her eat breakfast at their counter. CC did not remember any interaction with Appellant's roommate.

According to CC, after getting to Appellant's apartment, she ate her breakfast in Appellant's bedroom and fell asleep on Appellant's bed with Appellant also on the bed. She recalled scrolling through her phone and having her phone in her hand. She had been awake for approximately 20 hours at that point. The next thing she remembered was waking up, still with her phone in her hand, and noticing throbbing and pain in her vagina. She also saw that the side of the shorts she was wearing was rolled at her waist. Appellant was asleep next to her. CC then sat up and either hit Appellant's chest or face to wake him up and yelled his name. When Appellant woke up, CC asked him "What happened?" and Appellant responded, "We had sex."

CC immediately began to confront Appellant about what happened and Appellant told CC that he was spooning her, then he grabbed her breasts, "and got horny." Appellant also told CC "he started fingering [her and] that he put his penis into [her] vagina." CC asked Appellant how he got his penis inside of her. Appellant first told her that she "was already wet." However, CC called him a liar and "told him he ha[d] one more chance to tell [her] the truth, and that's when he told [her] that he used his saliva to get it inside of [her]." CC asked Appellant, "Was I moaning? Was I moving? Was I reciprocating? Was I making any noise?" Appellant told her no and told her "that's when he realized something was wrong, and then he stopped." CC then told Appellant to take her to her house.

When the two arrived at CC's house, she called SrA GC and told her that she thought Appellant raped her. SrA GC was still at the dorms at Nellis AFB, but told CC that she was on her way to their house. SrA GC found a ride back to her house. During the drive, SrA GC made a video call to Appellant and surreptitiously recorded the conversation. During the conversation, SrA GC asked Appellant if he "put [him]self inside" of CC and he said that he did and the "whole situation" lasted "no more than five to six minutes," but that he was "inside of her [for] no longer than a minute." Appellant also admitted CC was laying down and unconscious at the time.

Upon arriving at their house, SrA GC spoke to CC about her options regarding what had just happened. CC made the decision to call the Clark County Police Department and file a sexual assault report. Both CC and Appellant were ultimately interviewed by civilian and military law enforcement personnel and both were tested for DNA. CC completed a sexual assault forensic examination. After the Air Force completed its investigation, Appellant was charged with sexually assaulting CC.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant challenges the legal and factual sufficiency of his conviction for sexual assault and provides the court with six arguments. First, Appellant argues that his prior sexual relationship with CC makes it "very likely that CC consented" to the sex "even if she does not remember." Second, Appellant claims that the prior sexual relationship "also caused Appellant to reasonably believe that CC was awake and consenting at the time that he penetrated her vulva with his penis" because "[f]rom Appellant's perspective, that morning followed the same pattern as on previous occasions when he had consensual sex with CC." Third, Appellant argues that "[t]hrough her ambivalence and deceit, CC confused Appellant and misled the members," and as such she should not have been believed. Fourth, Appellant claims that his admissions on the recorded video phone call with SrA GC were not sufficient to satisfy the burden of proof. Fifth, Appellant contends his reputation and past behavior "strongly weigh against the notion that he would sexually assault CC while she was asleep." Sixth, Appellant argues the "forensic evidence does not corroborate CC's claims but does corroborate [his] version of events."

### 1. Additional Background

After CC made her report to law enforcement, a civilian sex crimes detective contacted and interviewed Appellant. Appellant told the detective that he "over pushed boundaries," but thought CC was conscious at the time he had sex with her. Appellant explained that they had sex before but this time, compared to the other times they had sex, it was different in that "there wasn't a lot of response back." He said that was when he "felt uncomfortable and stopped."

That same day, CC underwent a sexual assault forensic examination, which included a vaginal and cervical swab. During Appellant's court-martial a DNA expert testified that Appellant's DNA was not found on the vaginal or cervical swabs. However, the expert explained that one would not expect to find an individual's DNA when there is penile penetration into a vagina but no ejaculation.

Also during the court-martial, a panel member asked a question concerning the side effects of the narcotic, hydrocodone, that CC was given at the hospital for her ankle injury. To answer the member's question, a pharmacist from Nellis AFB was called to testify and explained that the general side effects of hydrocodone included dizziness, drowsiness, clouded behavior, issues with decision making ability, mood changes, impaired ability to conduct mental and physical tasks, problems with normal daily tasks, euphoria, and the lowering

of inhibitions. He also testified a lack of sleep could exacerbate and compound those side effects.

Trial defense counsel's cross-examination of SrA GC did not touch upon the truthfulness of the statements made during the conversation she recorded, but instead consisted mainly of questions designed to challenge her credibility. Examples of questions that trial defense counsel asked SrA GC included that she recorded the conversation she had with Appellant even though she told him she was not recording it; that SrA GC recorded the conversation so CC could have options regarding the sexual assault; that there were two recordings capturing their conversation even though she originally testified there was one; that she did not tell trial defense counsel she was taking notes while being interviewed by the defense team prior to trial; and that she wanted to help the Prosecution. The Defense also called witnesses to testify as to SrA GC's character for untruthfulness.

The defense in this case was in the alternative—consent or mistake of fact as to consent. To put this evidence in context, the military judge instructed the panel that for lack of consent, the members were to consider all the evidence concerning consent in determining whether the Government had met its burden of proof. The military judge also provided the definition of "consent" and explained to the panel that a "sleeping, unconscious, or incompetent person cannot consent," but that "[a]ll the surrounding circumstances are to be considered in determining whether a person gave consent." The military judge also instructed the panel as to mistake of fact, and explained in order to find that Appellant had a viable mistake of fact defense, he would have to show he had an actual incorrect belief that CC consented to the sexual conduct and that his mistake of fact must have been objectively reasonable.

The military judge also provided instructions regarding character evidence. As to SrA GC, the military judge provided an instruction as to "bad character for truthfulness." Regarding Appellant, she provided instructions concerning his "good character for truthfulness" and "character for respect toward[s] women," which she explained "may be sufficient to cause a reasonable doubt as to [Appellant's] guilt." However, she explained Appellant's "good character for respect for women may be outweighed by other evidence tending to show [Appellant]'s guilt." Finally, the miliary judge instructed the members how to properly consider any prior inconsistent statements attributable to CC and SrA GC.

### 2. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted). As we resolve "questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. We take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

In order to find Appellant guilty of sexual assault, in violation of Article 120, UCMJ, as alleged in Specification 1 of the Charge, the court members were required to find the following three elements beyond a reasonable doubt: (1) Appellant committed a sexual act upon CC (penetrating CC's vulva with his penis); (2) CC was asleep; and (3) Appellant knew or reasonably should have known that CC was asleep. *See Manual for Courts-Martial, United States* (2019 ed.), pt. IV, ¶ 60.b.(2)(e).

Mistake of fact as to a victim's consent is an affirmative defense to the offense of sexual assault. *United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019). If an accused holds, based on ignorance or mistake, an incorrect but reasonable belief relating to consent on the part of the victim, the accused is not guilty of the offense of sexual assault. *See* Rule for Courts-Martial 916(j)(1). The "mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances." *Id*. There must be some evidence of the mistake of fact for the military judge to instruct the panel. *United States v DiPaola,* 67 M.J. 98, 99 (C.A.A.F. 2008).

### 3. Analysis

Appellant does not allege a lack of evidence for purposes of the sufficiency of the evidence. Instead, he puts forth a combination of several arguments attacking the credibility of CC and SrA GC as well as citing evidence that either CC consented or that Appellant had a reasonable mistake of fact that CC consented. As outlined below, we disagree.

Here, the evidence supports findings that on 31 May 2020, Appellant committed a sexual act upon CC by penetrating her vulva with his penis; that it happened while CC was asleep; and that Appellant knew or should have

known that CC was asleep. A review of the evidence shows the following: During the early morning hours of 31 May 2020, Appellant drove CC to the hospital for an ankle injury. While at the hospital CC was prescribed hydrocodone for the injury which made her feel nauseated, dizzy, and extremely tired. CC had to be helped into Appellant's car after being released from the hospital. Appellant then drove CC back to his apartment, where they both laid down on Appellant's bed. Having been awake for approximately 20 hours, CC soon fell asleep. While CC was asleep, Appellant penetrated her vulva with his penis. He did this by moving CC's shorts up while she was asleep. Then, using his saliva to lubricate CC's vagina, he inserted himself into her. Although CC had no memory of Appellant doing this to her because she was asleep, when she woke up, CC felt throbbing and pain in her vagina and saw that the side of the shorts she was wearing was rolled at her waist. Appellant confirmed what CC was feeling by telling CC, "We had sex." He also told her that he used his saliva to lubricate her. Appellant also confirmed that CC was not moaning, not moving, not reciprocating, and was not making any noise, tending to show that any claim of mistake of fact was unreasonable. That CC was asleep and that any mistake of fact was unreasonable was further illustrated in a recorded video call with SrA GC, when Appellant confirmed he penetrated CC while she was unconscious.

Having given full consideration to Appellant's arguments and drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's conviction. Additionally, having weighed the evidence in the record of trial, and having made allowances for the fact that the members personally observed the witnesses and we did not, we also find the evidence factually sufficient.

We also address each argument Appellant raises and ask ourselves if we are convinced of Appellant's guilt beyond a reasonable doubt.

First, Appellant makes a two-fold argument based on his prior sexual relationship with CC. One part is that the prior relationship makes it "very likely that [CC] consented" to the sex "even if she does not remember." The other part is that the prior relationship caused Appellant to "reasonably believe that CC was awake and consenting at the time that he penetrated her vulva with his penis" because "[f]rom Appellant's perspective, that morning followed the same pattern as on previous occasions when he had consensual sex with CC." We are not persuaded. We consider all the surrounding circumstances. While a current or previous dating, or social, or sexual relationship is one piece of evidence for consideration as to consent, by itself, it does not constitute consent on a future occasion. Here, we cannot compare Appellant's and CC's prior sexual relationship to this incident because this

incident occurred after CC had taken medication, after an injury, after she had been awake for 20 hours, and while she was asleep. As such, we do not accept that this situation followed the same pattern as the previous sexual relations. Additionally, there were only two times that Appellant and CC had sex after they had broken up. In each of these instances, it was CC who had initiated the sex, not Appellant. There is simply no evidence before us to conclude that something similar to their past encounters occurred here. Therefore, it was not reasonable for Appellant to believe that sex would have occurred that morning, that CC wanted to have sex that morning, or she communicated to him that she wanted to have sex that morning. Additionally, even if we were to accept Appellant had a subjective belief that CC was awake or partially awake because she moved in her sleep, this does not equate to consent or a reasonable belief that CC consented to sexual relations. Additionally, his purported subjective belief is unconvincing because CC asked him in the morning if she was moaning, moving, or making any noise when he had sex with her, and Appellant told her "no."

Next, Appellant argues that "[t]hrough her ambivalence and deceit, CC confused Appellant and misled the members," and as such she should not have been believed. According to Appellant, CC sent him mixed signals on the night of the party because, despite having broken up with him, CC invited him to her party. We do not see this as a credibility or believability issue. CC explained that even though she had broken up with Appellant and had made it clear to him that she would no longer have sex with him, she still invited him because there had been a recent suicide at Appellant's squadron, Appellant was not taking it well, and he "told [CC] that he wanted some human interaction." Appellant continues that he "sought to end his relationship with CC that night by texting her, 'I don't think we should talk anymore' [and] 'I don[']t know your take. But that's my thought.'" However, there is no evidence in the record that CC read these text messages before she contacted him for a ride to the hospital. In fact, the opposite is true. CC testified that although her phone showed Appellant sent the text messages to her at 0141 hours, she did not read them until hours later. More to the point, from a subjective point of view, if Appellant text messaged CC that he did not think they should be talking anymore, there is no reason to think they would be having sex. Similarly, pointing out that CC did not tell law enforcement some things she told the members at the court-martial does not diminish her credibility. We accept that speaking to law enforcement shortly after being sexually assaulted and shortly after taking pain medication may result in not remembering every detail. We do not find this sufficient to create a reasonable doubt.

Appellant also claims that his admissions on the recorded video phone call with SrA GC were not sufficient to satisfy the burden of proof. As a general proposition of law, we agree with Appellant. Mil. R. Evid. 304(c)(1) provides

that an accused's admission or a confession may be admitted as to guilt or innocence only if there is independent evidence that would tend to establish the trustworthiness of the admission or confession. The salient portions of the recorded phone call include:

> [SrA GC]: [Appellant], when you see that someone is not awake, that means they're unconscious, you realize that right?
>
> [Appellant]: I know, I fe[e]l like s[**]t right now.
>
> . . . .
>
> [SrA GC]: Whatever you feel like, toss that s[**]t to the f[**]king wind, I don't give a f[**]k what you feel like.
>
> [Appellant]: I understand.
>
> [SrA GC]: She was laying down and unconscious, yes or no?
>
> [Appellant]: Yes.
>
> [SrA GC]: And you put yourself inside of her, yes or no?
>
> [Appellant]: Yes.
>
> [SrA GC]: For how long?
>
> [Appellant]: Actually inside of her, no longer than a minute.

Here, Appellant attacks the method by which SrA GC confronted Appellant and SrA GC's knowledge of the sexual encounter. Appellant asks this court to look to the circumstances under which the recording was obtained in determining what weight to give it. We have done so. Regardless of how angry SrA GC was with Appellant, how forceful her language was, what her own prior experiences were with sexual assault, her motivations, her lack of first-hand knowledge of what led to Appellant having sex with CC, we find that none of those things diminish Appellant's admission. SrA GC was not law enforcement, he was not in custody, and SrA GC did not outrank him. He admitted that he had sex with CC while she was unconscious. CC corroborated both of those things based on the pain in her vagina when she woke up and the fact that she was asleep the whole time. This corroboration is independent of Appellant's statements to CC that they had sex; independent of Appellant's statements to law enforcement that he "over pushed boundaries;" and independent of Appellant's statements to CC that she was not moaning, moving, reciprocating, or making any noise. While Appellant's statements to SrA GC alone may not have been sufficient to warrant a conviction, we find that when coupled with the other evidence in the case, we are convinced of Appellant's guilt beyond a reasonable doubt.

Next, Appellant contends that his reputation and past behavior "strongly weigh against the notion that he would sexually assault CC while she was asleep." He points to CC's testimony where she agreed that sexual assault was "out of character" for Appellant. Again, as a matter of general legal principles, we agree that evidence of an accused's character for respect towards women may be sufficient to cause a reasonable doubt as to his guilt. While Appellant's reputation and character for respect towards women lend to the idea that he may not be someone who "would" sexually assault a woman and that sexual assault was "out of character" for him, the evidence in this case, as outlined above, contradicts this notion. As the military judge instructed, "evidence of [an] accused's good character for respect for women may be outweighed by other evidence tending to show the accused's guilt." We find that the character evidence was outweighed by the evidence of guilt, as outlined above. Appellant's reputation and character for respect towards women do not move the needle, in our opinion, when he confessed to "push[ing] boundaries," and to having sex with CC while she was unconscious.

Finally, Appellant argues that the "forensic evidence does not corroborate CC's claims but does corroborate [his] version of events." He points to the forensic evidence that revealed no sign of injury or irritation to CC's vagina, and suggests that Appellant did not ejaculate inside CC. Even agreeing with Appellant's assertions, this evidence does not materially influence our analysis as to whether Appellant penetrated CC's vulva with his penis without her consent, and specifically, while she was asleep. This evidence would tend to show the level of physical force Appellant used in completing the sexual assault and that he did not ejaculate inside of CC, but does not disprove a sexual assault occurred.

We have made allowances for not having personally observed the witnesses, we have weighed the evidence in the record of trial, we have considered the inconsistencies as pointed out by Appellant, and we are convinced of Appellant's guilt beyond a reasonable doubt. Accordingly, we find his conviction factually sufficient.

**B. Good Faith Basis to Ask Questions**

Appellant claims that the military judge abused her discretion in allowing trial counsel to cross-examine a defense witness by asking, "[A]re you aware that [Appellant] had an allegation of sexual assault made against him at tech[nical] school?" Appellant attacks the military judge's ruling first by claiming that the source of the information was Appellant telling CC, and that CC is a biased witness; that CC never made the statement under oath; that the military judge failed to make "clear" findings of fact; and that Air Force Office of Special Investigations (AFOSI) Special Agent (SA) JM's testimony directly contradicted CC's claim that Appellant had told her he had been

interviewed by AFOSI in connection with a sexual assault allegation against him.

### 1. Additional Background

During the discovery phase of this case, trial counsel provided notice to trial defense counsel of statements Appellant made relevant to the case. Trial defense counsel then filed various motions concerning certain statements attributable to Appellant. One of the defense motions contains the statements in issue as follows:

> [ ] On 31 May 2021, [CC] participated in an interview with Las Vegas Metropolitan Police detective [LG], where she states:
>
> "[Appellant] literally was sitting there talking about how he had already had a sexual assault case on his records and he just like, never told me. And apparently some girl he was having sex with got jealous – this is just what he told me – got jealous that he was having sex with a different girl. So then she tried to say that he raped her."
>
> [ ] On 15 June 2021, [CC] participated in an interview with [AF]OSI. At approximately 20:57 minutes, [CC] states:
>
> "He said he got charged with a [Sexual Assault Response Coordinator (SARC)] case in tech school . . . He said that some girl claimed that he raped her because she was jealous that he had sex with another girl. He said he won the case, but after talking with other people, they said she could have just refused to participate."
>
> [ ] At approximately 41:24 minutes, [CC] states:
>
> "As far as his ex, her name is [J] . . . As far as the SARC case goes, when we first started dating, I had no idea about it. He just said it right in front of me and [SrA GC] . . . I believe [Appellant] said he had to speak to an [AF]OSI investigator, so I believe it went to that point. That means the girl's name should be on file and she can be contacted."

At trial, the Defense called SrA IA to testify. SrA IA was a close friend of Appellant and his roommate at the time of the sexual assault. He was an individual who testified that CC was coherent the morning of the sexual assault. SrA IA also provided his opinions that Appellant had a character trait of truthfulness and a character trait of respectfulness towards women.

Prior to cross-examination, trial counsel asked for a hearing outside the presence of the court members. During the hearing trial counsel put the

military judge on notice that the Government sought to test SrA IA's opinion that Appellant had a character trait of respectfulness towards women. To do this, trial counsel sought to ask a question similar to: "Did you know that [Appellant] had a prior allegation of sexual assault while he was in tech[nical] school?" According to trial counsel, it would "not be offered for any propensity purpose, but simply [for] the limited purpose of exploring the credibility of the witness's opinion . . . on that particular matter." The Defense objected, alleging that the Government lacked good faith to ask the question.

After allowing both sides to argue their points, the military judge ruled as follows:

> [N]o one will be bootstrapping anything that doesn't meet the rule. This is not being considered under [Mil. R. Evid.] 413 whatsoever. This is only to test the witness's veracity. It is not evidence, and it cannot be used as evidence of any such finding. To be honest, the court is not quite sure what the words, "SARC case" mean[ ]. It's not a vernacular, although the words mean something, I don't know what they mean together, and I have no idea what [Appellant] meant at that particular point in time that he might have made that statement. However, that is beside the point, there is a good faith basis before the [G]overnment to challenge this witness' knowledge about an issue the [D]efense put in, and that is respect towards women. If anything, the court does understand what a SARC issue is, and that seems to go directly in the face of respect.
>
> The court has considered [Mil. R. Evid.] 403, and yes, the court does agree, it is prejudicial, but it is not unduly so. The objection is overruled. The probative value is not outweighed by the danger of unfair prejudice, or confusion of the issues.
>
> Counsel, to be clear, you are only using that test of veracity, you have no such evidence, and no such evidence before this court. It will not be argued as such to any member at any point in time until such evidence is admitted, is that clear?
>
> . . . .
>
> I just wanted to clarify one point in my ruling. So, the basis of the [G]overnment's knowledge that the court has before it, is statements by [Appellant] to [CC] regarding his having a SARC case opened against him during tech[nical] school at Randolph Air Force Base. The court understands SARC to be a Sexual Assault Response Coordinator, and that SARC is involved in sexual assault allegations or anything under the offense of

Article 120. Whether or not a SARC case open[ed] means that there would in-fact be documentation, the court is unaware of that knowledge and therefore that is the consideration saying that that is a good faith basis and why the objection was overruled.

As it relates to this issue, trial counsel asked SrA AI, "[Y]ou also testified on direct examination that you've known [Appellant] for a while and that he has a character for respectfulness towards women, is that correct?" SrA AI answered, "Yes, sir." Trial counsel next asked, "[A]re you aware that [Appellant] had an allegation of sexual assault made against him at tech[nical] school?" SrA AI responded, "No sir, I did not know that." Immediately after SrA AI's response, the military judge provided the court members the following instruction:

Members, I'm just going to give you one instruction. The witness was just asked whether he was aware or had heard of some matter. That is a permissible question to test the witness's credibility, but if there is no evidence of that matter you may not consider the question for any other purpose.

The Defense then called SA JM. Trial defense counsel asked if he found any "evidence" to "support that a sexual assault allegation was ever made against [Appellant] during tech[nical] school." SA JM testified that he did not. On cross-examination SA JM admitted that they also could not track down any of Appellant's former girlfriends even though they had attempted to do so.

**2. Law**

We review "a military judge's decision to admit evidence for an abuse of discretion." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (citation omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Id.* (citation omitted). "The standard requires that the military judge be clearly wrong in his determination of the facts or that his decision be influenced by an erroneous view of the law." *United States v. Dooley,* 61 M.J. 258, 262 (C.A.A.F. 2005) (footnote omitted). "When testing for an abuse of discretion, this Court does not substitute its judgment for the military judge's." *United States v. Grant*, 38 M.J. 684, 688 (A.F.C.M.R. 1993).

"When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion. On cross-examination of the character witness, the military judge may allow an inquiry into relevant specific instances of the person's conduct." Mil. R. Evid. 405(a).

"Counsel may test a witness's opinion regarding the character of another person by asking 'have you heard' or 'are you aware' type questions which refer to specific instances of conduct—as long as there is a good faith basis for asking the question, and the question is otherwise permissible under the rules of evidence." *United States v. Witt*, No. ACM 36785 (reh), 2021 CCA LEXIS 625, at *91 (A.F. Ct. Crim. App. 19 Nov. 2021) (unpub. op.) (citing *United States v. Saul,* 26 M.J. 568, 572 (A.F.C.M.R. 1988)), *aff'd*, __ M.J. __, No. 22-0090, 2023 CAAF LEXIS 379 (C.A.A.F. 5 Jun. 2023). "The specific instances themselves are not offered to prove they did or did not occur, but rather to evaluate the proffered opinion." *Id.* (citing *United States v. Beno*, 324 F.2d 582, 588 (2d Cir. 1963) (additional citation omitted). The purpose of such questioning "is to raise questions as to whether the witness has a sufficient basis to know an accused's reputation in the community or to raise questions about the witness'[s] standard of evaluating good character." *United States v. Pruitt*, 46 M.J. 148, 151 (C.A.A.F. 1997).

When a witness's opinion is tested, the military judge must test for prejudice under Mil. R. Evid. 403. *United States v. Pearce*, 27 M.J. 121, 125 (C.M.A. 1988). "Admittedly, the potential for undue prejudice can increase as the impeaching offense more closely approximates the charged offense." *Id.* "However, that [is] a risk undertaken by the defense in electing to present affirmative character evidence." *Id.* Military judges are afforded broad discretion in applying Mil. R. Evid. 403, but we give less deference to military judges "if they fail to articulate their balancing analysis on the record." *United States v. Collier*, 67 M.J. 347, 353 (C.A.A.F. 2009) (citation omitted).

### 3. Analysis

We find the military judge did not abuse her discretion in permitting trial counsel to test the foundation of SrA AI's opinion that Appellant had a character of respectfulness towards women. Our analysis is in three parts.

First, the nature of the question, testing a witness's opinion on character, directly related to part of Appellant's defense at trial and on appeal is that he is not the kind of person that would commit sexual assault because he is respectful of women. SrA AI testified that Appellant had a character trait of respectfulness towards women and had known him since technical school, but knew him better at their duty station and from being roommates. This left the impression that Appellant's character for respectfulness towards women dated back to the entire time that SrA AI knew Appellant. The fact SrA AI was not aware of a possible allegation tends to undermine the basis for his opinion about Appellant's character. Therefore, SrA AI's opinion was entitled to less weight.

Second, we find that trial counsel had a good faith basis for asking the question. The question was based on the statements that CC made to law enforcement regarding what Appellant reportedly told CC. These statements included that while he was in technical school a woman became jealous and made some sort of sexual assault allegation against him because he had sex with someone else. The law simply required trial counsel to have a good faith basis for asking the question. Here, Appellant knew from the discovery phase of the case onward that this evidence was out there. In fact, he filed a motion to preclude CC from testifying about it during the Government's case in chief. We recognize Appellant's position is that CC was a spurious witness from the beginning. However, our independent review of the evidence leads us to a different conclusion. The Defense opened the proverbial door. This was simply a risk undertaken by the Defense in electing to present affirmative character evidence. *Pearce*, 27 M.J. at 125.

Third, we address the military judge's analysis under Mil. R. Evid. 403. We start with the military judge's ruling. She stated she had "considered [Mil. R. Evid.] 403, and yes, the court does agree, it is prejudicial, but it is not unduly so. The objection is overruled. The probative value is not outweighed by the danger of unfair prejudice, or confusion of the issues." However, she did not articulate how she arrived at her conclusion. As a result of her failure to fully articulate her analysis, we grant the military judge's Mil. R. Evid. 403 ruling less deference than we otherwise would have given it.

Mil. R. Evid. 403 explains that evidence may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice. Here, Appellant was alleged to have sexually assaulted CC and there is no question that asking about a previous allegation of sexual assault was prejudicial. Both trial counsel and the military judge said as much.

On the one hand, we consider that the probative value of the question, in and of itself, was not very high, considering SrA AI had no knowledge of the allegation. The members were not permitted to consider the truth of the allegation. We also consider that trial counsel did not follow up to test whether SrA AI's opinion would change knowing that information. Finally, we consider that the facts presented in the question were not corroborated.

On the other hand, regarding the danger of unfair prejudice, we consider that the question did not trigger any members asking questions, even though they asked other questions throughout the court-martial; that it was the Defense that opened the door knowing that the evidence existed; and that the attributes SrA AI testified about and his familiarity with Appellant since technical school directly relate to the question asked. After trying to portray himself as someone who would not commit sexual assault based on his character for respectfulness towards women, Appellant cannot claim surprise

17

that the Government sought to test the basis for that characterization. *See Michelson v. United States*, 335 U.S. 469, 485 (1948) (noting that defendants "have no valid complaint at the latitude which existing law allows to the prosecution to meet by cross-examination an issue voluntarily tendered by the defense" (citation omitted)).

We do not find the military judge abused her discretion in allowing trial counsel to test SrA AI's opinion by asking about the prior sexual assault allegation. We conclude the relevance of testing the basis for SrA AI's opinion was not substantially outweighed by the danger of unfair prejudice. Trial counsel was not required to let SrA AI's testimony go unanswered or its basis untested in front of the members. Therefore, the question was relevant. While the question was clearly prejudicial, we do not characterize it as unfairly prejudicial in light of the fact it was the Defense which offered the witness and the witness's opinion in the first place. We further note that trial counsel only asked the one question and SrA AI claimed no knowledge of the allegation. The question lacked any specific details and only asked if SrA AI knew Appellant had been accused. Again, the military judge instructed the members as to how to properly view this question and answer. Absent evidence to the contrary, we will presume court members follow the instructions they are given by the military judge. *United States v. Stewart*, 71 M.J. 38, 42 (C.A.A.F. 2012). Therefore, we conclude Mil. R. Evid. 403 would not operate to prohibit the question posed by trial counsel.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. *See* Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court